1997-NMSC-058

949 P.2d 660

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Paul Randall COOPER, Defendant–
Appellant.**

**No. 22504.**

Supreme Court of New Mexico.

Nov. 3, 1997.

278

Phyllis H. Subin, Chief Public Defender, David Henderson, Assistant Appellate Defender, Santa Fe, for Defendant–Appellant.

Tom Udall, Attorney General, Steven S. Suttle, Assistant Attorney General, Gail Mac-Questen, Assistant Attorney General, Santa Fe, for Respondent.

## OPINION

FRANCHINI, Chief Justice.

1 Paul Cooper was convicted for felony murder, second-degree murder, armed robbery, two counts of aggravated battery, and numerous other crimes in connection with the death of Gary Marquez. Cooper raises two issues: first, that he involuntarily made incriminating remarks to hostage negotiators during an armed standoff with police; second, that several of his convictions subject him to multiple punishments for the same offense in violation of his constitutional right to be protected from double jeopardy. We conclude that Cooper's remarks to the hostage negotiators were voluntary and affirm his felony murder conviction. However, we hold that all of Cooper's duplicative convictions, with the exception of one of his aggravated battery convictions, are unconstitutional. We vacate the unconstitutional convictions and remand for resentencing.

## I. FACTS

2 In May 1992, Paul Cooper learned that his HIV infection, which he had contracted several years earlier, had developed into AIDS. He concluded his death was imminent.

3 Cooper found the prospect of wasting away in a hospital to be intolerable. He admired Everett Ruess, an artist and adventurer who, in 1934, at the age of twenty, disappeared in the Escalante canyons of Utah. Cooper decided to emulate Ruess by leaving civilization for the Utah Canyonlands where he could die with dignity. He gathered camping gear, survival books, two hand guns, a hunting rifle, and a skinning knife. Some of these items were paid for with worthless checks. He also fashioned homemade bombs and several devices spiked with nails. He fancied using these to booby trap the road should anyone attempt to track him down because of the bad checks.

4 On the evening of Sunday, May 17, Cooper went to a gay bar called The Ranch. He intended to leave for the Canyonlands the following morning. Viewing that night as the last time he would see civilization, he decided to "party a little bit." Cooper met Gary Marquez at The Ranch that evening. Marquez had recently cashed his paycheck and was carrying several hundred dollars in cash. Cooper and Marquez agreed to meet at Cooper's apartment to engage in acts of sexual bondage.

5 Around midnight they arrived in separate cars at Cooper's apartment. Cooper testified that as they began their sexual encounter, he began to have second thoughts; he was unable to perform sexually because he feared transmitting the AIDS virus to Marquez and felt he should be preparing to leave town. Cooper testified that he asked Marquez to leave; Marquez was offended and berated Cooper saying, "What, am I not good enough for you?" Cooper stated that he pushed Marquez and the two began to struggle.

6 In contrast to this version of events, Cooper later told police, "I was just gonna take his car ... [a]nd just go to Utah. Just live ... in the wilderness, right? ... Well, he was just supposed to knock out. He wasn't supposed to fight back."

7 Cooper testified that, during the struggle, Marquez picked up the skinning knife from a pile of camping gear. When the fight was over, Marquez lay dead with twenty-two stab wounds. He also had been struck with a metal pipe and a barbell. The State's pathologist testified Marquez died from a combination of "multiple stab wounds and blunt trauma of the head, trunk, and extremities." Cooper's right hand was incapacitated, the tendons of two fingers having been severed.

8 All Cooper could think of was to "just get the hell out of there." He realized he could not manipulate with his wounded hand the manual transmission in his own Volkswagen. He also later told police investigators that his car "wasn't good enough to make the trip." In the early hours of May 18, 1992, he left Albuquerque in Marquez's car.

9 During the trip, he realized he could not function in the wilderness with his injury. He decided to drive to Malibu, California, to seek help from his sister, Gloria Cooper, who used to be a registered nurse. He testified that, while stopping for a rest in Arizona, he discovered Marquez's cash tucked into a pocket in the car door. At some point along the way, he concocted additional explosives.

10 In the afternoon hours of May 18, upon arriving in Ventura, California, Cooper was too exhausted to drive any further. He checked into the Shores Motel around 4:00 p.m., California time, and called his sister. To Gloria he sounded agitated, emotional, and irrational. During the conversation she eventually learned that Cooper had killed someone in Albuquerque. He told her about his hand injury and that he brought several firearms. He said his life was over and that he intended to kill himself. Fearing that he might hurt himself or someone else, she told him she would have to contact the Ventura police. He asked her to wait so he could figure out what to do.

11 Gloria related what she knew about Cooper's circumstances to the Ventura police. Around 10:00 p.m. New Mexico time, the Albuquerque Police Department received notice from Ventura of a possible homicide in Cooper's apartment. The Albuquerque police obtained a key from Cooper's landlord and opened the door to discover Marquez's nude body. They proceeded to obtain a search warrant and a warrant for Cooper's arrest.

12 About an hour before midnight, California time, a Ventura Police Department SWAT unit began to assemble at the Shores Motel where Cooper was staying. They secured the area to prevent Cooper from leaving and removed other guests from the motel. Eventually, at least twenty police, including a sharpshooter were surrounding the motel. A "Hostage Negotiating Team" set up a command post in a trailer nearby. The Ventura Police Department did not attempt to contact Cooper until the warrant for his arrest had been obtained by the Albuquerque police.

13 About 4:45 a.m., on May 19, 1992, the Negotiating Team established phone contact with Cooper. At first he hung up several times, saying he did not want to talk. After repeated phone calls and exhortations shouted through a police bullhorn from the motel parking lot, Cooper spoke to the negotiators. Rotating members of the Negotiating Team kept Cooper on the phone.

14 While they talked, the police in the command post tape recorded the conversation. Homicide investigators stood by listening. The negotiators never informed Cooper they were taping the conversation. Nor did they advise him that anything he said could be used against him in a court of law. In testimony, Cooper depicted himself as being in physical and emotional anguish; he felt trapped and surmised that the motel was surrounded by armed officers. He claims that he attempted to avoid answering their questions, but could not resist the constant phone calls and commands over the bullhorn.

15 The police, on the other hand, considered this to be a high-risk situation involving a suicidal murder suspect who was barricaded in a motel room with weapons and explosives. Detective David Williams, one of the officers at the scene, indicated the SWAT team had two main objectives: to arrest Cooper under the homicide investigation and to prevent him from killing himself and hurting anyone else. In testimony, Detective Bob Anderson, who was also at the scene, described the methods used to achieve these goals: "The SWAT technique is to continue conversation and to talk and talk and talk until you convince them to surrender peacefully." In cross examination, Anderson was asked, "So you were employing a technique of trying to break down his will; isn't that right?" He responded, "That's one way you can put it, I guess."

16 The police negotiators, on several occasions during the two-and-one-half hours of conversation, asked Cooper to tell his "story." Some of their questions directly requested information about the murder, as when one negotiator said, "Well, hey Paul, why don't you tell me the story again. Start from the beginning." Cooper made numerous incriminating statements. For example:

My side of the story is, I'm crazy and I killed somebody okay.

Yeah, uh, you know, I've killed somebody and I'm the killer now, it's like there's nothing to stop me from doing it more.

Cooper repeatedly complained of exhaustion, confusion, hopelessness, and physical pain. They promised to obtain medical help for his hand. They also promised, upon his request, that they could provide psychiatric help.

17 Cooper finally surrendered at 7:20 a.m. Among his belongings, police found his voter registration card with a notation on the back, hand-written and scratched out, stating, "Kill Reagan, then myself."

18 He was taken to a hospital for medical treatment, and thereafter to the Ventura Police headquarters for interrogation. Ten days later Cooper was extradited to New Mexico. In each of these three situations, he made incriminating remarks. At the hospital and during the Ventura interrogation he stated that he thought he should have an attorney. The police continued asking questions.

19 In Albuquerque Cooper did sign a waiver of his *Miranda* rights and gave a statement to police. Cooper claimed that he felt asking for an attorney would be useless because, as he testified, "I had already asked for one repeatedly. Obviously I wasn't going to get one so what difference does it make." In his statement to the Albuquerque police he claimed he went to California to assassinate former presidents Nixon and Reagan; in testimony he claimed this was a lie. On several occasions he described a plan to knock out Marquez and rob him of his car; at trial, Cooper recanted this confession, claiming he invented this story to avoid disclosing his inability to perform sexually.

20 In June 1992 a grand jury indicted Cooper for numerous crimes including murder, armed robbery, aggravated battery, possession of an explosive or incendiary device, and fraud by worthless check. In the months preceding the trial, Cooper made motions to suppress statements that were made after he requested an attorney, as well as "evidence of oral or wire communications" intercepted by the Ventura police during the motel conversations. The court did suppress the statements made in the hospital. Cooper's motion to suppress the motel conversations was denied.

21 A jury trial was held between June 20 and July 1, 1994. At trial, the State contended that Cooper deliberately lured Marquez to his apartment intending to kill him and steal his car. The defense introduced the testimony of psychologists in an attempt to show that Cooper suffered an extreme emotional crisis under the stress of believing he was dying of AIDS and that this impaired his ability to waive his rights; furthermore, because of his own weakened emotional state and pressure by the police negotiators, the incriminating remarks at the motel were involuntary. Cooper testified that his various incriminating statements were motivated by a desire for the death penalty in despair of his approaching death from AIDS.

22 On July 1, 1994, the jury acquitted Cooper of deliberate intent murder, but found him guilty of second-degree murder. Additionally, he was convicted of felony murder, with second-degree murder as a lesser-included offense, which under New Mexico law is first-degree murder. See NMSA 1978, § 30–2–1(A)(2) (1980, prior to 1994 amendment) (amendment subsequent to the cause of action does not affect the issues in this case). The jury also found him guilty of aggravated battery with a deadly weapon and aggravated battery in a manner that could cause great bodily harm. See NMSA 1978, § 30–3–5(C) (1969) (aggravated battery); UJI 14–322 NMRA 1997 (deadly weapon); UJI 14–323 NMRA 1997 (bodily harm). He was further convicted for armed robbery, attempted arson, two counts of possession of an explosive or incendiary device, and three counts of fraud by worthless check.

23 On August 30, 1994, the court sentenced Cooper to life imprisonment for felony murder. Merged to that sentence was a sentence of nine years for second-degree murder. Cooper further received nine years for armed robbery, to run consecutively to the life sentence. The court gave him three years for each of the two counts of aggravated battery, merging those two counts into one another and running them consecutively to the life sentence. These sentences, and

the others which are not at issue in this case, resulted in a cumulative sentence of life plus fifteen years imprisonment.

24 Cooper now appeals, claiming that his incriminating statements to police were involuntary and that the multiple convictions violated his right to be protected from double jeopardy. We affirm in part, reverse in part, and remand.

## II. VOLUNTARINESS OF CONFESSION

### A. Standard of Review

25 In evaluating the voluntariness of confessions, New Mexico courts have adopted a three-phase analysis articulated by the U.S. Supreme Court in *Culombe v. Connecticut,* 367 U.S. 568, 603–05, 81 S.Ct. 1860, 1879–81, 6 L.Ed.2d 1037 (1961). *See Aguilar v. State,* 106 N.M. 798, 799–800, 751 P.2d 178, 179–80 (1988) (discussing *Culombe*). On appeal, this analysis compels a de novo review of whether the defendant's incriminating remarks were voluntary. *See Collazo v. Estelle,* 940 F.2d 411, 415 (9th Cir.1991).

26 In the first phase, "there is the business of finding the crude historical facts, the external, 'phenomenological' occurrences and events surrounding the confession." *Culombe,* 367 U.S. at 603, 81 S.Ct. at 1879. In other words, the court begins with a "[d]etermination of what happened." *Id.* We are not restricted to examining only those facts deemed dispositive by the trial court. *See Collazo,* 940 F.2d at 415. We will look to the totality of the circumstances as a basis for our legal conclusion. *Aguilar,* 106 N.M. at 799–800, 751 P.2d at 179–80. However, when faced with conflicting evidence, we will defer to the factual findings of the trial court, as long as those findings are supported by evidence in the record. *Culombe,* 367 U.S. at 603, 81 S.Ct. at 1879. Our determination under this first phase is presented in the preceding discussion of the facts of this case.

27 The second phase is a "determination of how the accused reacted to the external facts." *Id.* at 604, 81 S.Ct. at 1880. This is an admittedly imprecise effort to infer—or imaginatively recreate—the internal psychological response of the accused to the actions of law enforcement officials. *See id.* at 603, 604, 81 S.Ct. at 1879, 1880.

28 The third phase is an evaluation of "the legal significance" of the way the accused reacted to the factual circumstances. *Id.* at 604, 81 S.Ct. at 1880. This requires "the application of the due process standards to the court's perception of how the defendant reacted." *Aguilar,* 106 N.M. at 800, 751 P.2d at 180. We are not required to accept the trial court's legal conclusion that the police officers did not act coercively. *See Collazo,* 940 F.2d at 415.

29 The U.S. Supreme Court deemed the second and third phases of this inquiry to be "inextricably interwoven." *Culombe,* 367 U.S. at 604, 81 S.Ct. at 1880. This is because "[t]he notion of 'voluntariness' is itself an amphibian. It purports at once to describe an internal psychic state and to characterize that state for legal purposes." *Id.* at 604–05, 81 S.Ct. at 1880. Thus, under this three-phase analysis, "we review the entire record and the circumstances under which the statement or confession was made in order to make an independent determination of whether a defendant's confession was voluntary." *State v. Fekete,* 1995 NMSC 056, 120 N.M. 290, 298, 901 P.2d 708, 716; *see also Aguilar,* 106 N.M. at 799, 751 P.2d at 179.

30 The prosecution bears the burden of proving by a preponderance of the evidence that a defendant's statement was voluntary. *Fekete,* 1995 NMSC 056, 120 N.M. at 298, 901 P.2d at 716. The state must demonstrate that the methods by which the incriminating remarks were obtained "are compatible with a system that presumes innocence." *Miller v. Fenton,* 474 U.S. 104, 116, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985). Thus, the preponderance of the evidence must establish that the confession was not "extracted from an accused through fear, coercion, hope of reward or other improper inducements." *State v. Turnbow,* 67 N.M. 241, 253–54, 354 P.2d 533, 542 (1960). The failure to make such a showing requires a ruling that the confession was involuntary as a matter of law. *State v. Tindle,* 104 N.M. 195, 198, 718 P.2d 705, 708 (Ct.App.1986).

## B. Voluntariness

### 1. Voluntariness versus *Miranda*

31 The parties' arguments raise the interrelated, but distinct, proscriptions against introducing into evidence statements made in violation of the Fifth Amendment protections under *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), and introducing an involuntary confession. *See* U.S. Const. amend. V (defendant cannot be compelled "to be a witness against himself"). "A claim that the police coerced a statement requires a different analysis than a claim that an accused voluntarily waived his or her Fifth Amendment protections under [*Miranda*]." *Fekete,* 1995 NMSC 056, 120 N.M. at 298, 901 P.2d at 716.

■ 32 *Miranda* requires that a suspect must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630. However, it is possible for a suspect to voluntarily waive his or her *Miranda* rights and still make an involuntary confession because police used fear, coercion, hope of reward, or some other improper inducement. *See Turnbow,* 67 N.M. at 253–54, 354 P.2d at 542.

### 2. *Miranda*

33 The essence of *Miranda* is that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. Cooper claims that he "was in custody when the police surrounded the motel" and that he "was subjected to the functional equivalent of interrogation when the investigators listened and recorded the SWAT team's questioning." The resolution of this argument centers on whether Cooper was in custody within the meaning of *Miranda.*

34 *Miranda* defines "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* It would seem that this definition would encompass Cooper's circumstances. However, the consensus among courts that have examined this issue supports the conclusion that Cooper was not in police custody.

35 Similar *Miranda* arguments were raised under similar circumstances in *United States v. Mesa,* 638 F.2d 582, 584–89 (3d Cir.1980). In that case, Mesa, suspected of a gun incident, barricaded himself in a motel room surrounded by police officers. When phone contact was established, an FBI hostage negotiator sought to persuade him to surrender. The conversations were tape recorded and Mesa made incriminating remarks. *Id.* at 583–84. Mesa sought to suppress the recorded conversations because he had not received *Miranda* warnings. *Id.* at 584. The Third Circuit concluded that "[t]he circumstances under which Mesa talked with [the negotiator] can be distinguished from the custodial setting that concerned the *Miranda* Court." *Id.* at 586. Much of the *Mesa* court's reasoning is applicable to this case. *See also State v. Stearns,* 178 Wis.2d 845, 506 N.W.2d 165, 166–69 (Wis.Ct.App.1993) (similar facts and arguments).

■ 36 It is true that Cooper had no liberty to leave the motel room and go where he wished. But the lack of freedom to come and go as one pleases is not the only factor that renders an interrogation custodial. *See Mesa,* 638 F.2d at 587. *Miranda* was focused upon the private and secret interrogation of a suspect in an isolated environment completely controlled by law enforcement officials. *See Miranda,* 384 U.S. at 447–50, 86 S.Ct. at 1613–15. Isolation is the key aspect of the custodial interrogation under *Miranda. See Mesa,* 638 F.2d at 585–86; *Stearns,* 506 N.W.2d at 167 (discussing "incommunicado interrogation"). "In this setting, the police have immediate control over the suspect—they can restrain him and subject him to their questioning and apply whatever psychological techniques they think will be most effective." *Mesa,* 638 F.2d at 585.

It is much easier, in such a setting, for investigators, intent upon obtaining a confession, to crush a suspect's will. *See id.*

37 Cooper's circumstances at the motel are distinguished from this type of incommunicado interrogation in several important respects. Cooper was not trapped in a room in which interrogation was the only possible option. He was capable—police perseverance notwithstanding—of hanging up the phone, at least briefly. *See id.* at 586. He was not in the physical presence of an interrogating officer where severing contact is never a possibility. *See People v. Brewer,* 720 P.2d 583, 586 (Colo.Ct.App.1985). He was not restricted exclusively to a discussion of his alleged crimes. The police did not have the psychological advantage of so focusing the conversation. *See Mesa,* 638 F.2d at 586–87. Any control the police attempted to exert over the subjects of conversation centered on convincing Cooper to surrender without hurting himself or anyone else. *Cf. id.* at 586. Furthermore, unlike a custodial interrogation, Cooper was not entirely at the mercy of the police. By threatening to use his bombs and guns he held them at bay and prevented them from gaining control over his actions. *Id.*

38 Moreover, the relationship between Cooper and the negotiators was not custodial because it would not be characterized as adversarial. *See id.* at 589–90 (Adams, J., concurring); *Stearns,* 506 N.W.2d at 168. It is true that the police knew, when first contacted by Gloria Cooper, that Cooper was suicidal, and that despite this knowledge, they did not attempt to contact Cooper until they had learned of the warrant for his arrest several hours later. This suggests they were not overly concerned about the possibility that he might kill himself. However, this inference, by itself, does not prove that the police intended to coerce a confession from Cooper.

39 The comments and questions of the negotiators were directed at peacefully resolving the standoff. The negotiators needed to obtain Cooper's trust by conveying sympathy and by showing that they were listening to his concerns. This could only be achieved by encouraging him to talk about his injuries, his distress, his feelings of suicide, and the events that brought him to such a pass. "Verbal efforts to obtain an accused's surrender or to prevent him from committing suicide or injury to others is not interrogation." *State v. Bowen,* 491 N.E.2d 1022, 1024 (Ind. Ct.App.1986). There was no intent to trick him into confessing or making incriminating remarks. *See Mesa,* 638 F.2d at 589–90 (Adams, J., concurring). In fact, any overt attempt to use psychological tricks or coercive power to compel Cooper to incriminate himself could have been disastrous. *See id.* at 586. If Cooper, barricaded in a motel room with firearms and explosives, felt certain that the police were only interested in convicting him of murder, he might have become extremely dangerous.

40 Moreover, we do not believe that in such circumstances police should be required to give a *Miranda* warning. In a supercharged setting like an armed standoff between a criminal suspect and police, such a requirement could have devastating consequences. Telling a suspect that anything they say could be used against him in a court of law could undermine the trust that must be established between the suspect and the negotiator. It could escalate the dangers of a situation that might otherwise be resolved peacefully. *See id.* at 589; *Stearns,* 506 N.W.2d at 168.

### 3. Voluntariness

41 Under certain circumstances, such as the "public safety" exception recognized in *New York v. Quarles,* 467 U.S. 649, 655–60, 104 S.Ct. 2626, 2631–33, 81 L.Ed.2d 550 (1984), a statement taken in violation of *Miranda* may be admissible. However, "[a] coerced or involuntary statement, which violates a suspect's rights under the Fifth Amendment, is not admissible at trial for any purpose." *United States v. Guerro,* 983 F.2d 1001, 1003 (10th Cir.1993).

42 Cooper's arguments regarding the voluntariness of his incriminating remarks implicate the second phase of the *Culombe* analysis—his psychological response to the actions of the Ventura police. *See Culombe,* 367 U.S. at 603, 604, 81 S.Ct. at 1879,

1880. He alleges that the police obtained involuntary statements from him in California by coercing him into talking with them for several hours at the motel at a time when he was suicidal and suffering from fatigue, physical trauma, remorse over having committed a murder, and depression due to his belief that he was dying of AIDS. Cooper claims he attempted to avoid talking to the police but was unable to resist their persistent calls and harassment through the bullhorn; the SWAT negotiators exploited his weakened state by using coercive techniques designed to break down his will; he thus could not avoid responding to questions that could only be answered by offering information about his crimes. Additionally, he emphasizes that homicide investigators exploited these coercive tactics by eavesdropping on and recording his incriminating remarks. He further suggests that all subsequent incriminating remarks, in the hospital, on the way to the airport, and during interrogation in Albuquerque—were fruits of the original involuntary confession. He urges us to find that the trial court erred in introducing his incriminating statements into evidence.

43 The State, on the other hand, implicating the third phase of the *Culombe* analysis, denies that, as a matter of law, the police conduct was coercive or that Cooper's statements were involuntary. *See id.* at 604, 81 S.Ct. at 1880. The State claims the police had no interest in eliciting incriminating comments from Cooper during the motel standoff. They knew they were dealing with a traumatized person who was suicidal, who was suspected of a brutal murder, and who was barricaded in the motel room with firearms and homemade bombs. The record indicates that the police approached the situation with two objectives in mind: to prevent Cooper from hurting himself or anyone else, and to arrest him as a suspect in Marquez's murder. The State claims that the incriminating remarks, in light of these objectives, were entirely incidental and unavoidable.

■ 44 The U.S. Supreme Court held in *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986), "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." New Mexico courts also apply this rule. *See, e.g., Fekete,* 1995 NMSC 056, 120 N.M. at 299, 901 P.2d at 717; *State v. Vasquez,* 109 N.M. 720, 722, 790 P.2d 517, 519 (Ct.App. 1990). Thus, though Cooper may have felt a certain compulsion to talk to police, his incriminating statements might not—*as a matter of law*—have been involuntary. Specifically, as stated above, we look to whether the police used fear, coercion, hope of reward, or some other improper inducement. *Turnbow,* 67 N.M. at 253–54, 354 P.2d at 542.

■ 45 When addressing this issue, we examine the totality of the circumstances. *See Aguilar,* 106 N.M. at 799–800, 751 P.2d at 179–80. We must look not only at Cooper's mental distress, but also, from the perspective of the police, the urgency and danger of the situation. "Thus, rather than a threshold requirement, a defendant's mental state at the time he or she makes incriminating statements to the police is only one factor for the trial court to consider when determining whether such statements were voluntary." *Fekete,* 1995 NMSC 056, 120 N.M. at 299, 901 P.2d at 717.

46 Some of Cooper's inculpatory remarks may have been induced by the questions of the negotiators. However, we have already demonstrated that under *Miranda* there was no police misconduct. We do not find, under any other standard, evidence of misconduct on the part of the police negotiators. "The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly,* 479 U.S. at 170, 107 S.Ct. at 523.

47 Cooper was most likely in a weakened mental state, and it is true that Detective Anderson conceded that the SWAT team used "a technique of trying to break down" Cooper's will. However, the police were trying to break Cooper's will to commit suicide, as well as overcome his resistance to surrendering peacefully; they were not attempting to force Cooper to confess. Essential to this goal was the offer of empathy for the agonizing events that led to his confrontation with police. "Since there was no police activity

that coerced defendant to give his statement, the due process clause of the fourteenth amendment is not implicated." *Vasquez*, 109 N.M. at 723, 790 P.2d at 520.

■ 48 The negotiators made no attempt to use fear or coercion by making threats. Nor did they offer hope of reward or make promises to induce Cooper to confess. Although they promised Cooper medical attention and psychological counseling, none of these promises were contingent upon a confession. *See Tindle*, 104 N.M. at 198–200, 718 P.2d at 708–10 (discussing effect of promise of leniency on voluntariness of confession).

49 Though Cooper argues otherwise, we are not faced with a situation like that of *Aguilar v. State* in which the police officer not only knew the defendant was mentally impaired, but also exploited this knowledge, inducing him to confess. *See* 106 N.M. at 800, 751 P.2d at 180. The Ventura police negotiators were not attempting to obtain evidence for a criminal investigation by exploiting Cooper's distress. Rather, they employed psychological tactics of empathy and compassion to defuse a potentially deadly situation. When Cooper made statements about the crime, the negotiators turned the conversation toward the urgent task of obtaining Cooper's safe surrender.

50 Because we find Cooper's remarks at the motel were not coerced, we conclude that there was no involuntary confession to taint his subsequent statements to both the Ventura and Albuquerque police. *Cf. Collazo*, 940 F.2d at 421 (discussing factors involved in determining effect of previous police coercion on subsequent incriminating remarks). There is no suggestion that these subsequent statements added any substantially new information to that already obtained at the motel. *See Fekete*, 1995 NMSC 056, 120 N.M. at 301, 901 P.2d at 719 (later statements "provided essentially the same information" as allegedly involuntary confession). Even if we were to find error in admitting these statements, it would be harmless. The evidence from the motel supports the jury's conclusion that Cooper intended to knock out Marquez and steal his car, thus justifying a verdict of felony murder. With the exception

of the double-jeopardy claims discussed below, his other convictions are similarly supported by the record. Though the motel evidence arguably conflicts with some statements made later to police, we will defer to the factual determination of the trial court because it is supported by the evidence. *See Culombe*, 367 U.S. at 603, 81 S.Ct. at 1879.

51 The same arguments address the possibility that the police may have continued to ask questions after Cooper requested an attorney at the hospital and during the Ventura interrogation. The comments Cooper made at the hospital were suppressed by the trial court. *Cf. Arizona v. Roberson*, 486 U.S. 675, 684, 108 S.Ct. 2093, 2099, 100 L.Ed.2d 704 (1988) ("[A] suspect's request for counsel should apply to any questions the police wish to pose . . . ."); *Freeman v. State*, 723 S.W.2d 727, 732 (Tex.Crim.App.1986) ("Once a defendant invokes his right to counsel, he may not be subjected to further interrogation until counsel is present, unless the defendant himself initiates dialogue with the authorities."). However, regardless of any facts that may have been gathered by interrogators after Cooper was arrested, it is apparent from the record that Cooper's conviction is supported by his remarks during the motel standoff. Our examination of the record shows that the subsequent interrogations yielded largely duplicative information to that obtained during the standoff. If the latter statements were introduced at trial, their effect was harmless.

## III. DOUBLE JEOPARDY

52 The New Mexico Constitution, like its federal counterpart, protects any person from being "twice put in jeopardy for the same offense." NM Const. art. II, § 15; *see also* U.S. Const. amend. V. The Double Jeopardy Clause has been interpreted to offer three distinct constitutional protections: "[I]t (1) protects against a second prosecution for the same offense after acquittal; (2) protects against a subsequent prosecution for the same offense after conviction; and (3) protects against multiple punishments for the same offense." *State v. Pierce*, 110 N.M. 76, 84, 792 P.2d 408, 416 (1990) (Emphasis omitted.) (citing *Illinois v. Vitale*, 447 U.S. 410,

415, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980)). Cooper claims, and the State partially concedes, that his multiple convictions violate the third of these protections.

■■■■ 53 Cooper argues that the felony murder and second-degree murder convictions subject him to two convictions for a single crime; the fact that there was only one murder victim means he can be convicted only once for murder. Similarly, he notes that the armed robbery is the underlying felony for his felony murder conviction; because the homicide constituted the force or violence inherent in the armed robbery, he cannot be separately convicted for the robbery. Cooper also points out that the State brought only one charge of aggravated battery, though it did so under two theories—battery with a deadly weapon and battery in a manner that could cause great bodily harm; thus, he claims, only one battery conviction is appropriate. *See* UJI 14–322 (deadly weapon); UJI 14–323 (bodily harm). The State agrees that, in each of these three instances, Cooper's double-jeopardy rights were violated. There is thus no dispute that we should vacate Cooper's second-degree murder conviction, his armed robbery conviction, and one of his aggravated battery convictions.

■■■■ 54 However, the State disputes Cooper's argument that he cannot be convicted for both aggravated battery and felony murder. Cooper contends that aggravated battery was the conduct that caused the death of Marquez and that he cannot in this way be twice convicted for the same act. The State counters that Cooper claimed to have hit Marquez over the head, intending to knock him unconscious so that he could steal his car. Under the State's theory, at that point the aggravated battery was complete. Thereafter, Marquez resisted and the violence escalated, ultimately ending in Marquez's death.

55 This problem appears to have been partially the result of juror confusion. The prosecution charged Cooper with numerous crimes, many of which were offered in the alternative. On several counts, the jury returned guilty verdicts on more than one alternative. The trial court attempted to ameliorate the duplicative convictions by running

concurrently with one another both murder sentences as well as both aggravated battery sentences. The State concedes that, in those instances in which the jury found Cooper guilty under two alternative theories, he should only be convicted of one crime.

## A. Standard of Review

56 In *Swafford v. State* we adopted a two-step process for determining whether multiple punishments for a single incident are impermissible under the Double Jeopardy Clause: First, the court inquires "whether the conduct underlying the offenses is unitary," that is, whether the conduct that violates more than one statute must nevertheless be viewed as a single transaction. *Swafford v. State*, 112 N.M. 3, 13, 810 P.2d 1223, 1233 (1991). Second, if the first part is answered in the affirmative, the court "focuses on the statutes at issue to determine whether the legislature intended to create separately punishable offenses" for the unitary conduct. *Id.* The second step of the *Swafford* analysis involves consideration of several factors. *Id.* at 14–15, 810 P.2d at 1234–35. However, because we conclude that the conduct in this case is not unitary, we need not examine the second part of the *Swafford* test.

57 We vacate Cooper's convictions for second-degree murder and armed robbery, and one of his convictions for aggravated battery. We apply the *Swafford* analysis to the convictions for aggravated battery and felony murder—the only convictions about which the parties disagree. We conclude that the second aggravated battery conviction should not be vacated.

## B. Unitary Conduct

■■■■ 58 Cooper argues that the conduct that gave rise to his convictions for felony murder and aggravated battery was unitary because Marquez died during the struggle in which the battery occurred. The State counters that the battery was a distinct event from the struggle that resulted in Marquez's death. Cooper's arguments raise the question of whether battery is always a lesser included offense of second degree murder

when the conduct that constitutes the battery is indistinguishable from the conduct that causes death. *Cf. State v. Campos,* 1996 NMSC 043, ¶ 23, 122 N.M. 148, 156, 921 P.2d 1266, 1274 ("[I]t is impossible to commit second degree murder without committing some form of both aggravated assault and aggravated battery."). However, we will not address that issue because the facts of this case do not support Cooper's claim that the acts of battery and second degree murder were unitary.

59 "Unitary conduct" is often defined by what it is not. Thus, conduct is not unitary "if the defendant commits two discrete acts violative of the same statutory offense, but separated by sufficient indicia of distinctness." *Swafford,* 112 N.M. at 13, 810 P.2d at 1233. The "indicia of distinctness" include the separation between the illegal acts by either time or physical distance, "the quality and nature" of the individual acts, and the objectives and results of each act. *Id.* at 13–14, 810 P.2d at 1233–34. Distinctness may also be established by the existence of an intervening event, the defendant's intent as evinced by his or her conduct and utterances, the number of victims, and the behavior of the defendant between acts. *Herron v. State,* 111 N.M. 357, 361–62, 805 P.2d 624, 628–29 (1991). The resolution of this question turns upon which version of the events— Cooper's or the State's—is best supported by the evidence.

60 The record shows that Cooper applied force to Marquez with several deadly weapons: a metal pipe, a barbell, and a knife. *See* § 30–3–5(C) (application of force with a deadly weapon); UJI 14–322 (aggravated battery with a deadly weapon). Notwithstanding Cooper's statements that he only intended to "knock out" Marquez, forceful application with any of these weapons was capable of causing "great bodily harm or death." Section 30–3–5(C). Thus, both of the alternative counts of aggravated battery are supported by the evidence.

61 However, the evidence shows that death was not the consequence of the initial act of battery. The first attack with one of the weapons was followed by a struggle. There is no suggestion in the record that Marquez was rendered even temporarily incapacitated by the first blow. As Cooper stated, "Well, he was just supposed to knock out. He wasn't supposed to fight back." In other words, there is no evidence that, after the first act of battery, all the subsequent injuries with the pipe, the barbell, and the knife were inflicted upon a person who had died as a result of the initial application of force. The struggle was an intervening event between the initial battery and the acts that caused the death of Marquez. *See Herron,* 111 N.M. at 361–62, 805 P.2d at 628–29. This conclusion is supported by the fact that Marquez was injured by three different weapons. If the act of battery and the act of murder were simultaneous and indistinguishable, it is improbable that Cooper would have been driven to use several different weapons.

62 We thus find that Cooper's initial act of battery was distinguishable and separated by an intervening event from the acts that resulted in Marquez's death. The conduct that gave rise to Cooper's convictions for aggravated battery and felony murder cannot be characterized as unitary. We therefore affirm one of his convictions for aggravated battery.

## IV. CONCLUSION

63 For the forgoing reasons, we hold that Cooper's statements to police during the motel standoff were voluntary. We affirm his conviction for felony murder and one of his aggravated battery convictions. However, because Cooper's multiple convictions violate Cooper's right to be protected from double jeopardy, we vacate his convictions for second-degree murder, armed robbery, and one of his aggravated battery convictions. We remand for resentencing in accordance with this opinion.

64 **IT IS SO ORDERED.**

BACA, J., and JAMES A. HALL, District Judge, concur.