# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**NO. 30,088**

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

vs.

**CARLOS GARCIA**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DONA ANA COUNTY**
**Douglas R. Driggers, District Judge**
**Silvia Cano-Garcia, District Judge**
**Lourdes Martinez, District Judge**

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Max Shepherd, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**CHÁVEZ, Chief Justice.**

{1}     Carlos Garcia (Defendant) appeals his convictions of two counts of first degree murder, conspiracy to commit murder in the first degree, armed robbery, conspiracy to commit armed robbery, two counts of kidnapping in the first degree, multiple counts of tampering with evidence, conspiracy to tamper with evidence, and arson relating to the deaths of two young men (the victims).  Defendant initially claims that he was denied effective assistance of counsel because (1) he was deprived of his ability to present an insanity defense; (2) his attorney failed to secure the testimony of a potentially exculpatory witness; and (3) his attorney did not call as witnesses at trial his co-defendant and certain unnamed police officers who had supposedly coerced testimony through threats.  Defendant then claims that the trial court erred in admitting his statement confessing to the murders.  Defendant also argues that the district attorney's office had a conflict of interest at trial because the district attorney was married to the lead investigator in the case.  Finally, Defendant claims that even if these errors are not individually sufficient grounds for reversal, cumulative error deprived him of his right to due process and a fair trial, warranting reversal.

{2}     Because we either reject or find insufficient evidence to support any of Defendant's claims, we affirm his convictions on all counts.

## I.     INEFFECTIVE ASSISTANCE OF COUNSEL

{3} Defendant claims that he received ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution in three ways, each of which we discuss in turn. The test for ineffective assistance of counsel is derived from *Strickland v. Washington*, 466 U.S. 668, 694 (1984):

> To establish a claim of ineffective assistance, a defendant must show error on the part of counsel and prejudice resulting from that error. An error is found if the attorney's conduct fell below that of a reasonably competent attorney. An error is not unreasonable if it can be justified as a trial tactic or strategy. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*State v. Schoonmaker*, 2008-NMSC-010, ¶ 32, 143 N.M. 373, 176 P.3d 1105 (internal quotation marks and citations omitted).

{4} Typically this Court prefers ineffective assistance of counsel claims to be heard in habeas corpus proceedings, since the trial record may not contain sufficient evidence to allow such a determination on direct appeal. *Id.* ¶ 31. Alternatively, the Court can remand to the trial court if the defendant has made a prima facie showing of ineffective assistance. *State v. Bernal*, 2006-NMSC-050, ¶ 33, 140 N.M. 644, 146 P.3d 289. However, we have been willing to decide the issue of ineffective assistance in some cases, such as when the complained-of incompetence was so obvious that the trial court should have been aware of it and the State does not dispute the relevant facts. *Schoonmaker*, 2008-NMSC-010, ¶ 31.

**A.    FAILURE TO PRESENT THE INSANITY DEFENSE**

2

{5} Defendant claims that he was denied effective assistance of counsel when his attorney deprived him of an insanity defense, "in spite of the clear indications that his mental condition at the time of the alleged murders was not sound[.]" According to Defendant, this deprivation occurred when his private defense counsel failed to take sufficient steps to secure funding for an expert from either the trial court or the Public Defender Department, or, when such funding was not forthcoming, failing to withdraw to allow Defendant to seek representation through the Public Defender Department, which would have paid for expert witnesses. The State argues that defense counsel actually "made a strategic decision after consulting with the Defendant and his family not to present [the insanity] defense." We hold that there is insufficient evidence in the record to allow us to decide whether or not counsel's performance was ineffective in this regard.

{6} Defendant's mental state was a central factor in the extensive pre-trial history of this case, during which Defendant was represented by four separate attorneys. Shortly after the January 5, 2000 killings of the victims, Defendant was evaluated by Dr. Thomas Calvin Thompson, who concluded that Defendant was "floridly psychotic" at the time of the evaluation. Defendant accordingly was deemed unfit to stand trial. Almost a year later, after having been found competent to stand trial, Defendant announced that he would pursue an insanity defense. Dr. Thompson concluded in a subsequent evaluation of Defendant that "there would have been an

extremely high probability that Mr. Garcia was quite psychotic at the time of the alleged crimes[,]" but that he needed "further information" to definitively make this determination. When Defendant's second court-appointed attorney made little progress in securing expert opinions on Defendant's mental state at the time of the crimes, he was removed as Defendant's lawyer. As the trial judge explained, "I feel that this case needs to move forward. [The insanity defense] is a unique defense, a difficult defense to present, important defense to present . . . and it has to be presented." After the third court-appointed attorney failed to meet Defendant's family's expectations, they hired private counsel Emeterio Rudolfo to take the case to trial.

{7}     The case was heard five years after the crimes were committed. By this time, Defendant's sanity at the time of the offenses had apparently been evaluated by Dr. Thompson, who testified at a pre-trial hearing that "it's a reasonable conclusion that [at the time of the crime] he was psychotic." In addition, Defendant's brain was analyzed by Dr. Ricardo Weinstein, an expert witness from California. Dr. Thompson testified that Dr. Weinstein's test results indicated that Defendant had "frontal lobe dysfunction, which [Dr. Weinstein] believed [was] consistent with both acquired as well as longer-standing features of mental illness and behavior control difficulties." The State responded to this evidence by hiring its own expert, Dr. Ned Siegel, who concluded that Defendant was not insane at the time the crimes were committed. Although questions have been raised about the preparation of

4

Defendant's experts, we are satisfied that consistent with the record, Defendant's sanity might have been a significant issue at trial.

{8} When Defendant's case finally came to trial in January 2005, defense counsel did not present an insanity defense. Defense counsel made no reference to a claim of insanity in his opening statement. The State presented a strong case based, inter alia, on evidence of Defendant's stated intention to kill the victims with a gun he had in his possession, the reported statements of co-defendant Steve Calderon, who claimed to have been present when Defendant murdered the victims, and Defendant's multiple confessions to different people. Apparently defense counsel had not yet informed either the State or the trial court whether it would present experts on insanity by the time the State rested its case. Defense counsel explained that "there is difficulty for the family to pay these experts." After a recess to discuss the issue with Defendant and his family, defense counsel returned to the courtroom, and stated:

> [Defense counsel:] Your Honor, I met with my client's family and then spoke with my client before and after that. The family doesn't have the means to pay the expert. We're going to proceed without the insanity defense.

> The Court: Okay. Is that correct, [Defendant]?

> [Defendant:] Yes, your Honor.

Defense counsel attacked the prosecution's case on a piecemeal basis, and Defendant

was found guilty on all charges.

{9} Defendant now argues that his private counsel, recognizing the importance of the insanity defense and the availability of funding through the Public Defender Department, should have either taken steps to secure that funding or recommended that Defendant seek representation from the Public Defender Department and then withdrawn. As Defendant puts it, "[c]ontinued representation of a client without adequate resources, when adequate resources are readily available elsewhere . . . would constitute ineffective assistance of counsel." As a result of this allegedly deficient performance, Defendant argues that he was prejudiced at trial.

{10} The State characterizes the decision to forego the insanity defense as "a strategic decision." The State also implies that since there was no hope of getting public funding while private counsel Rudolfo was Defendant's attorney, the family was presented with the decision of (1) whether to keep retained counsel and forego the insanity defense, or (2) to have private counsel withdraw and again request representation from the Public Defender Department. They chose the first alternative.

{11} The evidence before us is not sufficient to allow us to decide whether defense counsel's performance was deficient and, if so, whether Defendant was prejudiced by any deficiency. First, our case law suggests that defense counsel may or may not have performed deficiently, consistent with the facts in the record. We agree with the State that defense counsel's failure to approach the trial court or the Public

6

Defender Department for funding was not ineffective. At the time of Defendant's trial, *Subin v. Ulmer* provided that a trial court could not force the Public Defender Department to provide funding for expert assistance to a private attorney's indigent client. 2001-NMCA-105, ¶¶ 2, 4, 131 N.M. 350, 36 P.3d 441. After Defendant's trial, *Subin* was distinguished by *State v. Brown*, 2006-NMSC-023, ¶¶ 24-25, 139 N.M. 466, 134 P.3d 753, which obligated the Public Defender Department to provide funding for indigent clients of pro bono private counsel, provided certain criteria are met. In the case at bar, we have not been informed whether Rudolfo was working pro bono. Even if he had been working pro bono, we cannot hold that defense counsel's failure to anticipate *Brown* constitutes ineffective assistance of counsel. *State v. Savage*, 115 N.M. 250, 255, 849 P.2d 1073, 1078 (1992) ("On this record, Defendant has not carried his burden of showing a lack of competence. A showing that counsel has not anticipated a future development in the law is not sufficient. The adequacy of counsel's performance must be determined by the law in effect at the time of . . . trial." (internal quotation marks and citations omitted)). *Subin*'s language was broad, and we believe it could reasonably have been read by Defendant's attorney to limit the trial court's ability to require the Public Defender Department to provide assistance even to pro bono private counsel. *See* 2001-NMCA-105, ¶ 4 ("we find nothing in any constitutional doctrine or statutory provisions authorizing the district court generally to order the [New Mexico Public Defender] Department to provide services to people who are not its clients.").

7

{12}    However, we must still address Defendant's argument that defense counsel should have advised Defendant of the availability of funding through the Public Defender Department and then withdrawn. In *Schoonmaker*, the defendant faced child abuse charges resulting from severe injuries sustained by an infant for whom he was babysitting. 2008-NMSC-010, ¶ 2. He was indigent, but his family chose to pay for private counsel. *Id.* ¶ 1. The State's case hinged upon expert testimony on shaken baby syndrome. *Id.* ¶¶ 19-21. The family could not afford to pay for a medical expert, or even for interviews with the State's medical experts. *Id.* ¶ 7. When the trial court refused to provide assistance, defense counsel moved to withdraw from the case to assure that the defendant was able to receive expert assistance from the Public Defender Department. This course of action was also refused by the trial court. *Id.* ¶¶ 7, 18. This Court held that the denial of the motion to withdraw deprived the defendant of effective assistance of counsel and that a new trial was required. *Id.* ¶¶ 40-41. In reaching this result, the Court noted that there was no dispute about the centrality of expert opinion to the case; the fact that the defendant's inability to secure expert assistance was due to his "impecunious condition[,]" or the fact that he would have gone to the Public Defender Department but for the trial court's interference. *Id.* ¶¶ 33-34. This analysis demonstrated that the trial court had denied the defendant competent representation; as the Court observed, "[a] defendant's inability to pay for necessary experts is not a trial tactic or strategy[.]" *Id.* ¶ 34. Indeed, in this circumstance, the Court suggested that "any

8

competent counsel" would withdraw. *Id.* ¶ 18.

{**13**}    *Schoonmaker* suggests that defense counsel's performance may have been deficient. Although the trial court denied the defendant in *Schoonmaker* necessary but unaffordable expert assistance, it appears that if the same denial were effected by counsel's negligence, such as counsel's failure to advise the client that public subsidy was available, the defendant would also be denied competent representation. The problem in the case before us is that Defendant lacks evidence to support such a claim. For example, there is little direct evidence of the strength of his insanity defense as it would have been presented at trial. Although inability to pay for a necessary expert witness is not a trial strategy, unwillingness to either advise a client about or present a hopeless insanity defense certainly is. *See Burton v. State,* 82 N.M. 328, 331, 481 P.2d 407, 410 (1971) ("The failure of an attorney to advise a defendant of all possible defenses is no basis for a claim of incompetency of counsel."). Moreover, we are not presented with sufficient details of the circumstances under which the decision not to present the insanity defense was made. It is not clear when defense counsel first discussed the issue of expert costs with Defendant, or whether defense counsel ever informed Defendant of the availability of funding if he were to seek representation through the Public Defender Department. If the necessity of paying expert witnesses and the availability of alternative funding had been communicated to Defendant in a timely manner, but Defendant nevertheless requested defense counsel to proceed without the insanity

9

defense, it seems doubtful that defense counsel's performance would be considered deficient. Under New Mexico's Rules of Professional Conduct, "the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered[.]" Rule 16-102(A) NMRA; *see also State v. Richardson*, 114 N.M. 725, 730, 845 P.2d 819, 824 (Ct. App. 1992) ("if defense counsel pursued a defense Defendant insisted upon, counsel's performance in following that directive should not necessarily result in a new trial, even if found below the standards for effective assistance of counsel.").

{14} Nor does the Court have sufficient evidence to determine whether Defendant was prejudiced by the lack of an insanity defense. Defendant argues that Dr. Thompson's evaluations strongly suggest that he would testify to Defendant's insanity at the time of the offense. If presented, Defendant claims that "[a] properly mounted defense of insanity drastically alters the landscape of a criminal trial . . . and can have a dramatic effect on the ultimate disposition of the case[.]" The State contends that its experts would have contradicted any claim of insanity and that the testimony of the witnesses who had seen Defendant around the time of the killing would further undermine any such defense.

{15} To demonstrate prejudice, a criminal defendant normally must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Schoonmaker*, 2008-NMSC-010, ¶ 32 (internal quotation marks and citation omitted). Here, there is no direct

evidence showing how Defendant's experts would have testified at trial. Thus, we cannot balance the evidence to determine whether the case's outcome would have been affected by such a defense. However, although Defendant has not carried his burden, we are unable to conclusively hold that he was not prejudiced; as recited above, the record contains considerable evidence suggesting that it was *possible* that Defendant's experts could have supported a meaningful insanity defense.

{16} Since Defendant has not carried his burden of demonstrating deficient performance and prejudice even to the point of presenting a prima facie case, we reject this claim of ineffective assistance of counsel. However, if Defendant is able to develop more evidence, he may petition the trial court for a writ of habeas corpus on this point.

## B. FAILURE TO SECURE A POTENTIALLY EXCULPATORY WITNESS

{17} Next, Defendant argues that his attorney should have secured either a statement or live testimony from a cousin of one of the victims. The cousin supposedly stated that on the night of the murders, one of the victims had told him that the victims had a .22 handgun, the same caliber as the murder weapon, and were going out looking for rival gang members at whom they had previously shot. At trial, defense counsel attempted to introduce this statement through the testimony of Dave Fernandez, an investigator with the Doña Ana Sheriff's Department, who interviewed the victim's cousin. Defense counsel stated at trial that he was forced

11

to use Fernandez's testimony because defense counsel's investigator was unable to locate the victim's cousin in the vicinity of Anthony, New Mexico. Defense counsel argued that although Fernandez's statement was hearsay within hearsay, the victim's words were a statement against penal interest, Rule 11-804 NMRA, and the cousin's statement should come in under the catch-all hearsay exception, Rule 11-807 NMRA. The trial court rejected this position, arguing that there were insufficient steps taken to secure the cousin's attendance at trial and that the statements were neither reliable nor did they fall within any of the hearsay exceptions. Defendant does not now argue that this ruling was incorrect, but instead claims that it was ineffective assistance to fail to secure the cousin's attendance at trial.

{18} The State responds that Defendant has made no showing that had he moved for a continuance, he would have been able to find the missing witness. Moreover, the State contends that even if the witness had been present, there is not a reasonable probability that the jury would have found that someone other than Defendant was the shooter.

{19} We hold that counsel's assistance was not ineffective in failing to secure the cousin's testimony. Although defense counsel's performance may or may not have been deficient, we are able to conclude from the record that no prejudice resulted from this witness's absence at trial. First, there is no evidence that the cousin could have been found, even if defense counsel had made more diligent efforts. Second, it is by no means clear that the cousin would have been willing to testify at trial: as

12

both the State and Defendant suggested at trial, the victims' families had become unwilling to assist Defendant. *See State v. Hernandez*, 115 N.M. 6, 18, 846 P.2d 312, 324 (1993) (refusing to find ineffective assistance of counsel because the "[d]efendant has failed to demonstrate that the potential witnesses were willing to testify and would have given favorable evidence."). Third, and most importantly, even if the cousin had testified as Fernandez described, it is difficult to imagine that his testimony would have changed the trial's outcome. There was ample evidence that Defendant committed the murders: witnesses testified that they had seen Defendant with a gun on the day of the murders, heard him express his desire to kill someone, watched him get into the victims' car, and heard him make multiple confessions admitting that he had committed the murders. Considering the totality of the evidence presented at trial, we do not believe that the cousin's testimony was "of sufficient magnitude to call into question the reliability of the trial results." *State v. Reyes*, 2002-NMSC-024, ¶ 46, 132 N.M. 576, 52 P.3d 948. Since Defendant was not prejudiced, his ineffective assistance claim must fail.

## C. FAILURE TO CALL CO-DEFENDANT AND POLICE OFFICERS

{20} In his last ineffective assistance of counsel claim, Defendant argues that defense counsel should have subpoenaed (1) his co-defendant, and (2) unnamed police officers for questioning at trial. He claims that his co-defendant "made multiple statements that may have cast the veracity of Defendant's confession into doubt" and that the police officers "made threats and otherwise coerced testimony

against Defendant." Appellate defense counsel admits that regarding the police, "Defendant's communication on this point is relatively non-specific as to the identities of the police officers as well as the particular testimony that Defendant argues was coerced or improperly obtained." The State argues that Defendant's claims about the officers are without factual support, and his argument regarding co-defendant Steve Calderon is undermined by the lack of evidence that Calderon would actually have testified, since his conviction was on appeal during Defendant's trial.

{21} We reject this ineffective assistance claim; there is insufficient evidence in the record to allow us to decide it. It is well established that the burden of demonstrating ineffective assistance is on the defendant. *See State v. Hunter*, 2006-NMSC-043, ¶ 13, 140 N.M. 406, 143 P.3d 168. Defendant essentially admits that he made no such showing. We have no way of knowing whether defense counsel's performance was deficient or whether prejudice resulted. As with Defendant's first ineffective assistance claim, if sufficient facts do develop, Defendant may bring a habeas corpus petition to test his argument.

## II. ADMISSION OF DEFENDANT'S CONFESSION TO THE POLICE

{22} Defendant argues that the trial judge erred in refusing to suppress Defendant's allegedly involuntary confession to police, thereby violating his due process rights.[1]

---

[1]Defendant does not allege any difference between U.S. Const. amend. XIV and N.M. Const. art. II, § 18, and we accordingly decide this issue under federal

We review claims of involuntariness using the following analysis:

> The prosecution has the burden of proving the voluntariness of a defendant's statement by a preponderance of the evidence. On appeal, when determining whether a confession is voluntary, we review the entire record and the circumstances under which the statement or confession was made in order to make an independent determination of whether a defendant's confession was voluntary. In doing so, we examine the totality of the circumstances surrounding the confession in order to decide the ultimate question of voluntariness.

*State v. Fekete*, 120 N.M. 290, 298, 901 P.2d 708, 716 (1995) (internal quotation marks and citations omitted). *See also Aguilar v. State*, 106 N.M. 798, 799-800, 751 P.2d 178, 179-80 (1988) (describing a three-step review process, derived from *Culombe v. Connecticut*, 367 U.S. 568 (1961), involving consideration of the totality of the circumstances surrounding the confession, the accused's response, and a legal analysis of these factors).

{23} The substantive question that this analysis seeks to answer is whether "a defendant's will has been overborne and his capacity for self-determination critically impaired[.]" *State v. Munoz*, 1998-NMSC-048, ¶ 20, 126 N.M. 535, 972 P.2d 847 (internal quotation marks and citation omitted). In this test, mental capacity is only one element to be considered. *Fekete*, 120 N.M. at 299, 901 P.2d at 717. Indeed, New Mexico cases, citing *Colorado v. Connelly*, 479 U.S. 157 (1986), clearly hold

---

principles and the state cases that have been decided in consonance with them. *See State v. Gomez*, 1997-NMSC-006, ¶ 22, 122 N.M. 777, 932 P.2d 1.

that mental capacity alone cannot be a decisive factor in determining voluntariness. *State v. Cooper*, 1997-NMSC-058, ¶ 44, 124 N.M. 277, 949 P.2d 660 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." (internal quotation marks and citation omitted)); *see also Connelly*, 479 U.S. at 164 ("Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" (internal quotation marks and citation omitted)).

{24}     In other words, official misconduct is the sine qua non of an involuntariness claim. The mere fact that a defendant, due to mental illness or drugs, was incapable of recalling and retelling earlier events does not undermine his confession for due process purposes, absent some wrongdoing by the police. Police awareness of a mental impairment, however, raises the level of scrutiny we give to police tactics. *See, e.g., Aguilar,* 106 N.M. at 800, 751 P.2d at 180 ("In comparison with all evidence to the contrary, these implied threats and promises, especially when knowingly made to a defendant with diminished mental capacity, rendered the confession involuntary as a matter of law.").

{25}     Defendant points to three factors that he claims rendered his confession

16

involuntary: (1) he was intoxicated; (2) he was psychotic at the time of his arrest; and (3) the police pressured him to talk. The State responds that there is no evidence of marijuana use aside from Defendant's assertions, Defendant's statement does not indicate that he was confused about the nature of his questioning or otherwise incompetent, and there is no evidence of police misconduct. Therefore, the State argues that "there is no basis for finding that the Defendant's confessions were anything but voluntarily given."

{26} We hold that the State met its burden of establishing that Defendant's confession was voluntary. First, as far as intoxication is concerned, the only evidence before us is Defendant's bare assertion during his confession to the police. The officers who took the confession testified that they did not notice any signs of marijuana use on Defendant's part, and there is no other specific evidence that he used marijuana on the day of the murders. It appears that Defendant was alone the day he was arrested and the evidence is inconsistent regarding whether he smoked marijuana in the days leading up to his arrest. In any event, even if he had been smoking marijuana, Defendant himself admits that intoxication alone is not enough to undermine the voluntariness of his confession. *See State v. Ortiz,* 77 N.M. 316, 319, 422 P.2d 355, 357 (1967) ("A confession is not ipso facto inadmissible if made while under the influence of drugs."). Defendant has presented no specific evidence of impairment–or more importantly, police awareness of his claimed impairment–to undermine the evidence produced by the State. *See Munoz,* 1998-NMSC-048, ¶ 25

17

("Defendant's claim that he was in an intoxicated state at the time of the interrogation has no support in the factual record. . . . Defendant was not uncooperative or disassociative but, according to the uncontradicted testimony of [the investigating agent], appeared 'calm and laid back' during the interview. . . . [The agent] did not smell alcohol or perceive anything to indicate that Defendant's mental state was impaired."). Our own review of Defendant's statement does not uncover any signs of incapacity: Defendant understood the questions he was asked and answered appropriately.

{27}    Second, although Defendant argues that he was "patently insane" at the time of his arrest, the expert on whose authority this claim rests admitted before trial that he had neither reviewed the transcript nor the tape of the confession before rendering his opinion. In contrast, the State presented expert evidence, the testimony of police officers, and the testimony of other witnesses to support its claim that Defendant was mentally competent at the time of his confession. Even if Defendant could produce convincing evidence that he was mentally impaired at the time of his confession, he would have to demonstrate some sort of police awareness and associated overreaching in order to overcome the State's contrary evidence. *Cf. Cooper*, 1997-NMSC-058, ¶ 44 ("[T]hough [the defendant] may have felt a certain compulsion to talk to police, his incriminating statements might not–*as a matter of law*–have been involuntary. Specifically, as stated above, we look to whether the police used fear, coercion, hope of reward, or some other improper inducement.").

18

No such evidence has been forthcoming. In sum, the State has met its burden in the face of Defendant's claims of incapacity.

{28} Defendant also claims that police tactics rendered his confession involuntary. From our review of his confession, the only evidence of possible overreaching by the police came a few minutes into the interview, after Defendant had waived his rights and made some highly incriminating statements:

> [Defendant:] [The victim] took us and we . . . we were giving him directions of all . . . all over the places [sic] to take us and stuff, and then na [sic], but they led onto the crime. Uh . . . I'd rather not talk about it right now.
>
> [Investigator:] Okay.
>
> [Defendant:] I just . . .
>
> [Investigator:] Okay.
>
> [Investigator:] Okay, if you don't want to talk about it, that's fine. Can I ask you just a couple of questions then of what you told me in the car? Do you mind of [sic] I do that?
>
> [Defendant:] Uh . . .
>
> [Investigator:] Yes or no?
>
> [Defendant:] Uh . . . Go ahead sir.

(Ellipses in transcribed original.)

{29} After this exchange, Defendant recounted the confession he had earlier made to the police after his arrest. After repeating his earlier confession, the officers asked

19

Defendant to confirm that he had not been harmed, threatened, or forced to confess and that he understood his rights. The investigators then reminded Defendant that he had not wanted to discuss the events any further and allowed him to terminate the interview.

{30} We find no evidence to suggest that Defendant's "will was overborne." The police asked Defendant to repeat the statements he made in the car and reminded him that he had not wished to speak about anything further. They did not make any threats or promises and did not engage in any apparently coercive conduct. *See Fekete*, 120 N.M. at 299, 901 P.2d at 717 ("[T]he record does not indicate that [the defendant] was personally mistreated in terms of lengthy or abusive questioning by the police. Also, the record does not support any finding of overreaching by the police. The officers questioning [the defendant] did not threaten or coerce him, nor did they promise him any special treatment if he talked to them."). The State has carried its burden of demonstrating that Defendant's confession was voluntary.

## III.   CONFLICT OF INTEREST

{31} Defendant's final argument is that there was a conflict of interest in the proceedings below because the lead police investigator in this case was married to the Las Cruces district attorney, whose subordinates tried the case. Before trial, Defendant argued that this relationship was grounds for disqualifying the District Attorney's Office, and his argument was rejected. Defendant claims that to the extent he was prejudiced by this conflict, he was denied his due process rights and

20

his right to a fair trial. The State replies that Defendant has produced no evidence of prejudice, and as such, his claim must fail.

{32} We reject Defendant's claim. This Court reviews a trial court's decision not to disqualify a prosecutor under an abuse of discretion standard that gives due deference to factual findings but does not give deference to legal findings, *State v. Gonzales* 2005-NMSC-025, ¶¶ 24-25, 138 N.M. 271, 119 P.3d 151, as follows:

> [A] trial court should determine whether prosecution by a member of the district attorney's office is inconsistent with a particular standard of professional conduct, justifying disqualification of that person. When doing so, the court should indicate the relevant standard and the evidence demonstrating a violation of the standard. At this stage, the defendant has the burden of going forward with evidence and the burden of persuasion. The standard may be relatively clear in some cases, as it was in [*State v.*] *Pennington* [115 N.M. 372, 851 P.2d 494 (Ct. App. 1993)], in which the disqualified person had previously worked for the defendant on the same case. In other cases, the standard may not be so clear.

*Id.* ¶ 28 (internal citations omitted). Specifically, the defendant has the burden to show "particular circumstances that justif[y] an inference of a disqualifying interest." *Id.* ¶¶ 34, 40-47 (holding that the defendant had met his burden by presenting a series of witnesses to a prosecutor's bias.).

{33} During the hearing on his motion to disqualify, Defendant established the relationship between the district attorney and the lead investigator, but he did not explain how this created a conflict of interest or had a prejudicial effect on his case. Defendant did not point to any particular violation of the ethical rules caused by this

relationship. As a result, the trial court found that "the unrebutted testimony of [the investigator] raised no basis for disqualification of the District Attorney's office" and concluded that Defendant's motion should be denied.

{34} We agree with the trial court. The instant case presents one of the "not so clear" situations referred to in *Gonzales*, in which the defendant has the burden of showing some "particular circumstances" that should alert the Court to a potential problem. The marriage of these two parties alone is not enough. We concede that there exists a potential divergence between the prosecutor's "responsibility [as] a minister of justice[,]" Rule 16-308 NMRA (ABA Comment), and the investigator's responsibility to tenaciously investigate a case. However, where the record discloses no personal conflict, no potential leak of privileged information, or any particular evidence of prejudice whatsoever, we are unwilling to presume that the district attorney was unable to live up to her professional responsibilities. We find that the trial court did not abuse its discretion in denying Defendant's motion.

## IV. CONCLUSION

{35} Having either rejected or found insufficient evidence to support any of Defendant's claims, we also reject his contention that cumulative error justifies a reversal of his convictions. Accordingly, we affirm his convictions on all counts.

{36} **IT IS SO ORDERED.**

_____

22

                                         **EDWARD L. CHÁVEZ, Chief Justice**

**WE CONCUR:**


_____
**PATRICIO M. SERNA, Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**CHARLES W. DANIELS, Justice**

23