2008-NMSC-010

176 P.3d 1105

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Jake SCHOONMAKER, Defendant–Petitioner.**

**No. 28,954.**

Supreme Court of New Mexico.

Jan. 23, 2008.

374

John Bigelow, Chief Public Defender, Susan Roth, Assistant Appellate Defender, Santa Fe, NM, for Petitioner.

Gary K. King, Attorney General, Steven S. Suttle, Assistant Attorney General, Santa Fe, NM, for Respondent.

## OPINION

BOSSON, Justice.

{1} Defendant Jake Schoonmaker was charged with child abuse resulting in great bodily harm. Though he was declared indigent, and thus qualified for representation by the public defender's office, Defendant's family raised enough funds to retain private counsel to represent him. However, neither Defendant nor his family could afford to pay for expert witnesses that were essential to

his defense. Given no alternative, defense counsel tried unsuccessfully to withdraw in favor of the public defender so that, with public financing, his client could put on an adequate defense. By refusing to allow counsel to withdraw under these circumstances, or otherwise to order that the necessary services be provided, the district court essentially put Defendant in the position of receiving ineffective assistance of counsel. Accordingly, we reverse Defendant's convictions and remand for a new trial.

## BACKGROUND

{2} Defendant was indicted on August 9, 2000, for intentional child abuse resulting in great bodily harm, or in the alternative, negligent child abuse resulting in great bodily harm. *State v. Schoonmaker*, 2005–NMCA–012, ¶ 2, 136 N.M. 749, 105 P.3d 302. These charges arose out of an incident that allegedly occurred on July 24, 2000, when Defendant was babysitting the child ("Child") of a woman he was dating ("Mother"). *Id.* ¶ 4. Child, who had been born five weeks premature and had spent a week in the hospital, was just over one month old. *Id.* ¶ 3. Defendant was eighteen at the time and had no criminal record.

{3} About two hours after Mother left Child in Defendant's care, Defendant brought Child to Child's great-grandmother's ("Grandmother") house. Defendant told Grandmother that Child had rolled off the couch while Defendant was upstairs preparing some medication to give Child for a mild case of bronchitis. *Id.* ¶ 5 Grandmother noticed that Child had vomited and was pale, limp, and "just staring." *Id.*

{4} Child was eventually taken to UNM Hospital where medical tests revealed that he had suffered a severe subdural hematoma, retinal hemorrhages, and brain injury resulting in total blindness. *Id.* ¶ 6. Defendant repeatedly told family members and police that Child had fallen from the couch. *Id.* ¶ 7.

### Pre–Trial Proceedings and Reconstructed Record

{5} Defendant qualified for public defender representation, but his parents were able to afford private counsel. On December 10, 2001, the day set for Defendant's trial, defense counsel informed the district court that he had not been able to interview the State's doctors and other witnesses, that he needed a continuance, and that his client was trying to raise the money necessary to interview the State's expert witnesses. The trial was then continued until March 11, 2002.

### Reconstruction of the February 19, 2002, Pre-trial Hearing

{6} On February 19, 2002, a pre-trial hearing was conducted because defense counsel was still unable to secure the necessary funds to interview the State's doctors. Regrettably, we have no direct record of this hearing because much of it occurred in chambers without a record and because no transcript or other recording has been found for that portion of the hearing held in open court. No explanation has been offered for the absence of such transcript. Much later, after Defendant's conviction and during the course of this appeal, Defendant filed a motion to reconstruct the record, and the district court conducted a hearing, received evidence, and heard testimony in an effort to reconstruct what had transpired at the February 19, 2002, hearing. The record and transcripts on the motion to reconstruct the record are before us on certiorari, and are the closest thing we have to a record of the February 19, 2002, hearing.

{7} At the reconstruction hearing, defense counsel Andrew Ortiz ("Ortiz") testified that the State had demanded payment for the State's physician experts if the defense wanted to interview them. Ortiz testified that, as a result of this demand, he made an oral motion in open court at the February 19, 2002, pretrial hearing, that Defendant be declared indigent and the Public Defender Department ("PDD") be ordered to pay for a medical expert to assist in the preparation of a defense. According to Ortiz, the district court referred to the case of *Subin v. Ulmer*, 2001–NMCA–105, 131 N.M. 350, 36 P.3d 441,[1] and denied the motion. The parties and

---

1. The *Subin* court held that district courts do not have authority to order the State (through the PDD) to pay expert witness fees for indigent defendants represented by private counsel paid for by a third party. As will be discussed, *Subin*

the judge then went into chambers where the same expert witness issues were discussed further.

{8} Ortiz testified that he "vividly" remembered asking the court for permission to withdraw as counsel of record after the court denied his motion for state-funded experts. Ortiz recalled that the court denied this motion as well. Ortiz did not file any written motions about this matter after his oral motions were denied.

{9} As part of the efforts to reconstruct the February 19, 2002, pretrial hearing, Assistant District Attorney Lisa Trabaudo presented the court with her notes from that hearing. These notes indicated that Ortiz was having difficulty coming up with funds to pay the State's experts for interviews and that the parties discussed the *Subin* case.

{10} Defendant's father, Alton Schoonmaker ("Father"), had also been present at the February 19, 2002, hearing, and testified at the reconstruction hearing. Father stated that attorney Ortiz asked the district court to have the State pay for a medical expert because the family did not have the funds. He recalled that Ortiz informed the district court that Defendant qualified for State funding for a lawyer and that Ortiz would step down and let the PDD take over. Father testified further that the court then called counsel into chambers and when they came out, Ortiz informed him that the court had denied defense counsel's request for State funded experts and had also refused to allow Ortiz to withdraw from the case.

{11} Also forming part of the reconstruction was the affidavit of Alicia Harper, who was the court's bailiff when the February 19, 2002, hearing took place. In her affidavit, Ms. Harper stated that she vaguely recalled that prior to the first trial, Ortiz had asked to withdraw from the case. She also recalled that Ortiz was disappointed that he had no expert witnesses and the State had so many.

{12} After hearing the testimony of attorney Ortiz and Father, and reviewing the notes of Assistant District Attorney Trabaudo and the affidavit of Ms. Harper, the district court recalled that a discussion had

occurred in chambers regarding state-funded defense experts. However, the judge was not able to confirm or deny that he gave a ruling on defense counsel's request for payment for defense experts or that counsel had requested to withdraw.

{13} In its subsequent order, the district court found as follows:

[D]uring a pre-trial conference in chambers on February 19, 2002, counsel for the defense brought up the issue of having the State Public Defender office pay for expert witnesses. The Court noted its belief that there was a recent case that would apply under these circumstances, and the Court believed it could not order the Public Defender office to pay for expert witnesses. The Court further directed defense counsel to file a motion if defense counsel wished to, after reviewing the case. Upon the filing of a motion, the Court would reread the case and consider the issue.

The Order also stated that "[n]o written motion to withdraw or to have the State pay for expert witnesses was filed or ruled on by the [c]ourt," and the court had "no specific recollection whether counsel asked to withdraw ... or whether counsel made the request to withdraw in open court."

**Other Pre–Trial Proceedings**

{14} After the February 19, 2002, pre-trial hearing, defense counsel filed a motion to suppress witness statements because counsel still had not been able to interview the State's doctors, as well as the State's forty-one other witnesses. The motion stated that counsel would be rendering ineffective assistance of counsel because he could not adequately cross-examine the State's experts or prepare his defense if he was unable to interview the State's expert witnesses. On March 5, 2002, the judge and the parties discussed the difficulties with setting up interviews with the State's witnesses. The prosecutor stated that although the written motion to suppress alleged that defense counsel could not hire his own expert because he had not been able to interview the State's doctors,

has recently been modified by this Court in *State v. Brown*, 2006–NMSC–023, 139 N.M. 466, 134 P.3d 753.

she thought the real reason defense counsel could not hire an expert was the defense was having problems coming up with funds. The prosecutor again brought up the *Subin* case at this point.

{15} The judge stated that defense counsel could "probably afford" a half-hour interview with each of the State's doctors, and asked counsel if he had a case that suggested he would be ineffective as a matter of law if he did not conduct a pretrial interview. Counsel did not have any cases, and the judge told defense counsel to interview the State's witnesses and the suppression issue would be revisited on March 6, 2002. Defense counsel then objected to conducting any more interviews and indicated his desire to prepare his case with the six interviews that he had already conducted. The court refused to suppress the witness statements of those witnesses defense counsel had not interviewed and defense counsel stated his continuing objection.

## Question of Whether Defense Counsel Moved to Withdraw

{16} Critical to our analysis of the ineffective assistance issue is the question of whether defense counsel moved to withdraw from the case after being denied state funding for expert witnesses. While it is true that normally the appellant bears the burden of providing the appellate court with a transcript of the proceedings below, in this case, no transcript was made available to Defendant, and thus Defendant cannot be held accountable for failing to make it available on appeal. *See State v. Martinez*, 2002–NMSC–008, ¶ 12, 132 N.M. 32, 43 P.3d 1042. We are therefore left to draw inferences from the reconstruction hearing and the other hearings, keeping in mind that "[t]he basic interest at stake in a situation where a transcript or evidence is lost or missing is the assurance that justice is done, both to the defendant as well as the public." *State v. Fish*, 101 N.M. 329, 331, 681 P.2d 1106, 1108 (1984).

{17} Viewing the record on the motion to reconstruct along with the record of the other pre-trial proceedings, a few important points bearing on the question of withdrawal become clear. First, defense counsel's lack of funds was expressly brought to the district court's attention and both the court and the prosecution were aware of the problem this posed for the defense with regard to obtaining experts and interviewing the State's experts. Second, all present at the pretrial hearing remembered that defense counsel asked the court to order the PDD to pay for necessary defense experts and three witnesses recalled defense counsel's attempt to withdraw from the case in favor of the public defender when the court declined to order the PDD to pay. Third, no witness at the reconstruction hearing denied that defense counsel had moved to withdraw or directly contradicted his testimony to that effect, and the judge could not recall one way or the other.

{18} Additionally, we note that the State does not dispute in its briefing to this Court that defense counsel tried to withdraw due to a lack of funds. Nor does there appear to be any dispute regarding the critical importance of experts in this particular case, about which more will be said later in this Opinion. Therefore, in light of the foregoing and in the absence of a contrary determination by the district court, we will assume that defense counsel did in fact move to withdraw, as any competent counsel would have done under these circumstances.

## The Trials

{19} At Defendant's first trial, the State presented the testimony of two expert physicians on shaken baby syndrome. The defense presented no expert witnesses. The jury acquitted Defendant on two alternative counts of intentional child abuse, but was unable to reach a verdict on the two alternative counts of negligent child abuse (tortured or cruelly punished/endangered the life or health of the child). The court declared a mistrial on the two alternative counts of negligent child abuse.

{20} At the second trial on the two alternative counts of negligent child abuse, the State presented the testimony of *four* expert physicians, as well as the testimony of Child's pediatrician. Again, the defense presented no expert witnesses. Before the second trial, defense counsel was allowed a thirty-minute interview with each of the State's four ex-

perts, and the district court stated that the defense would not be required to pay for these interviews. However, defense counsel was never able to interview, and did not receive all of Child's medical records from Child's pediatrician, Dr. Vigil, or the pediatric ophthalmologist, Dr. Durso, because both doctors demanded payment for an interview before the second trial.

{21} At trial, the State's theory of the case was that Child's injuries were caused by violent shaking and that those injuries could not have happened any other way. No eyewitnesses testified that Defendant had shaken the baby in a violent manner. Defendant's theory of the case was that the diagnosis of shaken baby syndrome was incorrect and that Child's injuries were caused by his fall from the couch combined with his medical history relating to the premature birth and subsequent hospitalization.

{22} The evidence at the second trial consisted almost entirely of expert testimony that Child's injuries were consistent with shaken baby syndrome and could not have been caused by a fall from a couch. The State presented no external evidence of shaking, such as a neck injury or "gripping" bruises. The only statements relating to Defendant having shaken Child were his mother's prior statement (which she later denied at trial) that Defendant admitted shaking Child to revive the baby after he fell off the sofa, and Defendant's statement to the police and Mother that he had shaken Child's car seat while driving to keep him awake because he thought he might have a concussion. *See Schoonmaker*, 2005–NMCA–012, ¶ 7, 136 N.M. 749, 105 P.3d 302. The State's experts testified that Child's injuries involved more than waking a baby or even a panicked shaking to arouse the baby, and were consistent with violent shaking—shaken baby syndrome—which Defendant denied and no eyewitnesses confirmed.

{23} During the State's rebuttal closing argument, while telling the jury to disregard defense counsel's argument that the doctors could not date the old and new subdural hematomas, the prosecutor stated:

> There's no medical backing for what [defense counsel] wants you to believe. And he had every opportunity to bring you something to back up his smoke and mir-

rors. No expert there. If this was a rebleed from whatever that was before 7/24 and an expert was willing to say it was, if he could find such an expert, you would have heard it, and you didn't.

Despite what the prosecutor told the jury, the State does not dispute that the reason defense counsel did not call any expert witnesses was because of Defendant's inability to pay, not the inability to locate experts that would testify for the defense.

{24} A second jury convicted Defendant on both alternative theories of negligent child abuse resulting in great bodily harm. During sentencing, defense counsel asked the district court to enter a "judgment notwithstanding the verdict" and reminded the court:

> My client['s family] spent their entire budget trying to defend this case.... I don't charge a lot. They don't have enough money to pay for the experts that is [sic] readily available to the State, where the State came and told you [their experts] are paid for by the State. They never paid anybody any money, yet I was not allowed to, at least, ask assistance to get an expert on my client's behalf. They don't have the money.

The court denied Defendant's request and sentenced Defendant to the basic sentence of eighteen years, merging the two alternative counts of negligent child abuse. The court also determined that the offense was a serious violent offense under the Earned Meritorious Deductions Act, thus, limiting the amount of good time credit that Defendant was eligible to earn.

{25} Defendant appealed, this time with appointed counsel from the PDD, and the Court of Appeals upheld his conviction. The Court of Appeals held that (1) omission of the terms "negligently and without justification" from the jury instruction on negligent child abuse did not render the instruction ambiguous; (2) the use of a jury instruction on negligent child abuse that contained both objective and subjective standards did not constitute fundamental error; (3) Defendant's acquittal on intentional child abuse and subsequent retrial on negligent child abuse did not violate double jeopardy be-

cause intentional child abuse is not a lesser included offense of negligent child abuse; (4) at the second trial, the State was not collaterally estopped from arguing that Defendant shook the baby; (5) sufficient evidence existed to support Defendant's conviction; and (6) the district court properly determined that Defendant's conviction for negligent child abuse constituted a "serious violent offense" for purposes of the Earned Meritorious Deductions Act.

{26} Defendant, represented by different appointed counsel, filed a motion for rehearing in the Court of Appeals. The motion stated that, while reviewing the record proper and transcripts in preparing a petition for a writ of certiorari, newly-appointed counsel discovered substantial errors that had not been presented in the briefs on appeal and that the attorney who had prepared those briefs was no longer with the appellate division of the PDD.

{27} The rehearing motion argued that the district court erred in denying trial counsel's request to withdraw due to lack of sufficient funds to pay for experts, resulting in a denial of Defendant's rights to present a defense and to effective assistance of counsel under *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Alternatively, the motion stated that "if [trial] counsel proceeded to trial knowing that he needed expert testimony to counter the state's multitude of expert witnesses, counsel was ineffective *per se* by failing to withdraw so that [Defendant] could be represented by the Department and present a defense to the state's allegations." The motion also stated that Defendant's former appellate counsel was ineffective for failing to raise this issue on appeal. The motion went on to indicate that the issue of whether Defendant, who was represented by private counsel at trial, was entitled to funding for expert witnesses under either the Indigent Defense Act or the Public Defender Act, was pending before this Court in *Brown,* 2006–NMSC–023, 139 N.M. 466, 134 P.3d 753. Finally, the motion argued that the district court erred at sentencing in merging the two convictions for negligent child abuse rather than vacating one of those convictions. The Court of Appeals denied the motion for rehearing.

{28} Defendant petitioned this Court for a writ of certiorari and we granted the writ to review the following issues: (1) whether Defendant is entitled to a new trial because his trial counsel was *per se* ineffective when he failed to call expert witnesses due to lack of sufficient funds; (2) whether our Uniform Jury Instruction on negligent child abuse impermissibly uses a civil negligence standard by using a "knew or should have known" standard; (3) whether the district court should have instructed the jury to inform the court if it found that Defendant acted intentionally, a claim which was barred by Defendant's acquittal on this charge in the first trial; and (4) whether Defendant's right to be free from double jeopardy was violated by the district court's entry of judgment on and merger of the two verdicts for alternative counts of child abuse arising from the same act, and by the district court's finding that the offense was a "serious violent offense" under the Earned Meritorious Deductions Act.

## DISCUSSION

### Preservation

{29} The State asserts that we should not address Defendant's ineffective assistance claim or the merger issue because "nothing in the state constitution, statutes, or this Court's rules authorizes certiorari review of issues not considered in the court of appeals." This Court has certiorari jurisdiction to review "any civil or criminal matter in which the decision of the court of appeals ... involves a significant question of law under the constitution of New Mexico or the United States." NMSA 1978, § 34–5–14(B) (1966, as amended through 1972). The right to reasonably effective assistance of counsel is a fundamental right guaranteed under the Sixth Amendment to the United States Constitution, and the right to be free from double jeopardy is secured by the Fifth Amendment. We find that the Court of Appeals' decision to affirm Defendant's conviction and deny his motion for rehearing involves a significant question of law under the United States Constitution.

{30} Defendant raised the ineffective assistance and double jeopardy issues in his Motion for Rehearing to the Court of Ap-

peals and in his Amended Petition for Certiorari to this Court. The State had an opportunity to respond to the Motion for Rehearing, and the Court of Appeals is entitled to our presumption that the court reviewed and considered the arguments in Defendant's motion before rejecting it. Upon receiving Defendant's petition for certiorari, the State was permitted to file a response within fifteen days of service of the petition pursuant to Rule 12–502(E) NMRA, if it felt that the grounds for granting the petition were inadequate. The State filed no such response, and we granted certiorari on all the issues raised in Defendant's petition. Therefore, we will address the merits of Defendant's ineffective assistance of counsel and double jeopardy claims.

### Ineffective Assistance of Counsel

■ {31} We recognize that this Court has expressed a preference for habeas corpus proceedings as the avenue for adjudicating ineffective assistance of counsel claims. *See State v. Grogan,* 2007–NMSC–039, ¶ 9, 142 N.M. 107, 163 P.3d 494. This preference stems from a concern that "the record before the trial court may not adequately document the sort of evidence essential to a determination of trial counsel's effectiveness." *State v. Hunter,* 2006–NMSC–043, ¶ 30, 140 N.M. 406, 143 P.3d 168 (quoted authority omitted). However, we are not presented with such a case here. The basis for Defendant's ineffective assistance of counsel claim is the failure of his counsel to seek the assistance of necessary experts due to Defendant's inability to pay for those experts. The record demonstrates that these issues were made clear to both the State and the district court, and the State did not dispute these contentions below, nor does it do so now. Further, as we discuss below, the ineffective assistance issue was so obvious in this case that the district court must have been aware of it. *See Grogan,* 2007–NMSC–039, ¶ 10, 142 N.M. 107, 163 P.3d 494 (noting that "when 'attorney incompetence is so obvious that a trial judge ... should be aware of the threat to the defendant's Sixth Amendment right to counsel' the integrity of the judicial system is at risk" (quoting Galia Benson–Amram, *Protecting the Integrity of the Court: Trial Court*

*Responsibility for Preventing Ineffective Assistance of Counsel in Criminal Cases,* 29 N.Y.U. Rev. L. & Soc. Change 425, 429 (2004))). Therefore, contrary to the State's assertion that the record is too scant to make a determination about the effectiveness of counsel, we find that the issue is properly decided on direct appeal.

■ {32} To establish a claim of ineffective assistance, a defendant must show error on the part of counsel and prejudice resulting from that error. *Grogan,* 2007–NMSC–039, ¶ 11, 142 N.M. 107, 163 P.3d 494. "An error is found if the attorney's conduct fell below that of a reasonably competent attorney." *Id.* (quoted authority omitted). An error is not unreasonable if it "can be justified as a trial tactic or strategy." *State v. Bernal,* 2006–NMSC–050, ¶ 32, 140 N.M. 644, 146 P.3d 289. Prejudice is shown when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### Unjustified Error

■ {33} The primary issue before the jury was what caused Child's injuries: Was it violent shaking or was it a fall from a couch combined with problems associated with Child's premature birth? There were no witnesses to the events that occurred on July 24, 2000, and there was little in the way of circumstantial evidence demonstrating that Defendant had violently shaken the baby. Thus, the case hinged on whether the jury believed Defendant's story. "[W]hen a case hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence (or the lack of it) is the sort of neutral, disinterested testimony that may well tip the scales and sway the fact-finder." *Pavel v. Hollins,* 261 F.3d 210, 224 (2d Cir. 2001) (quoted authority omitted). Expert testimony was critical to the defense to call into question the State's expert opinions that Child's injuries could only have been caused by shaking of a violent nature. *See Gersten v. Senkowski,* 299 F.Supp.2d 84, 101 (E.D.N.Y.2004) (noting that "when a defendant is accused of sexually abusing a child

and the evidence is such that the case will turn on accepting one party's word over the other's, the need for defense counsel to, at a minimum, consult with an expert to become educated about the 'vagaries of abuse indicia' is critical"); *State v. Hales*, 152 P.3d 321, 344 (Utah 2007) (court held that defendant, who was convicted of murder of a child who died from injuries sustained when defendant allegedly shook him as a baby, was prejudiced by his counsel's failure to obtain a qualified expert to give an independent interpretation of CT scans of child victim). The State does not dispute, nor does the record demonstrate that it ever disputed, the necessity of expert testimony to the defense. Nor does the State challenge in its answer brief Defendant's assertion that disagreement exists in the medical community as to the amount of time between when injuries occur and when the child becomes symptomatic, and whether injuries like Child's can be caused by short-distance falls, particularly in light of Child's medical history.[2]

■ {34} Further, the State does not dispute that defense counsel's inability to consult with or call any experts or to interview certain prosecution experts was due to Defendant's impecunious condition. Defendant was found to be indigent and had qualified for public defender representation. Defense counsel repeatedly brought up his client's inability to pay for necessary expert witnesses, and the prosecutor argued that defense counsel's failure to interview State witnesses was likely due to a lack of funds. A defendant's inability to pay for necessary experts is not a trial tactic or strategy, and cannot be used to justify defense counsel's failure to consult with or call such experts as witnesses. *See Rey v. State*, 897 S.W.2d 333, 337–38 n. 13 (Tex.Crim.App.1995) (en banc) (recognizing the relationship between the fundamental right to effective assistance of counsel and an indigent's right to the appointment of an expert); *Ex parte Briggs*, 187 S.W.3d 458, 469–70 (Tex.Crim.App.2005)

(holding that retained counsel performed deficiently in limiting, for economic reasons, his investigation of medical evidence, before advising defendant to plead guilty); *see also id.* at 467 n. 22 ("If investigation of medical records to determine a child's cause of death is essential to the presentation of an effective defense, counsel cannot decline to conduct such an investigation based on his client's lack of financial resources, but still remain as trial counsel because '[e]ffective investigation by the lawyer has an important bearing on competent representation at trial ....'" (quoting ABA Standards for Criminal Justice, *The Defense Function Standard* 4–4.1 (2d ed.1986))).

**Prejudice**

■ {35} Normally it is the defendant's burden to show both incompetence and prejudice. *See Grogan*, 2007–NMSC–039, ¶ 11, 142 N.M. 107, 163 P.3d 494. However, a defendant is not required to show prejudice where there exist "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). We have held that such circumstances exist "where the trial court witnesses obvious incompetence." *Grogan*, 2007–NMSC–039, ¶ 15, 142 N.M. 107, 163 P.3d 494. Indeed, "in cases of obvious ineffective assistance of counsel, the trial judge has the duty to maintain the integrity of the court, and thus inquire into the representation." *Id.* ¶ 10.

■ {36} This is not a case where the district court was simply a passive witness to attorney incompetence. Rather, it is a case where the court, interpreting the law as it then existed, felt compelled to deny counsel access to the necessary funding and therefore to become ineffective. Despite counsel's indications that his client could not pay for

---

**2.** Such disagreement is demonstrated by testimony of defense experts in other similar cases as well as medical literature. *See People v. Basuta*, 94 Cal.App.4th 370, 114 Cal.Rptr.2d 285, 294–95 (2001). *See generally* Marcus B. Nashelsky & J.D. Dix, *The Time Interval Between Lethal Infant Shaking and Onset of Symptoms*, 16 Am. J. Forensic Med. & Pathol 154–57 (1995); John

Plunkett, *Fatal Pediatric Head Injury Caused by Short–Distance Falls*, 22 Am. J. Forensic Med. & Pathol 1, 10 (2001); James LeFanu & Rioch Edwards–Brown, *Patterns of Presentation of the Shaken Baby Syndrome: Subdural & Retinal Hemmorhages Are Not Necessarily Signs of Abuse*, BMJ, Mar. 27, 2004, at 767 (available at http://www.bmj.com/cgi/content/full/328/7442/767).

any experts and that he would be rendering ineffective assistance if he went to trial without the assistance of such experts or the ability to interview the State's experts, the court refused to allow counsel to withdraw. Thus, counsel was placed in an untenable position: refuse to proceed without an order of withdrawal and risk being held in contempt, or proceed without necessary experts. This is not a choice any effective counsel should have to make. A presumption of prejudice most certainly applies when counsel's potential ineffectiveness is expressly brought to the attention of the district court and is occasioned by the rulings of the court itself. *See Rey,* 897 S.W.2d at 345 (declining to conduct harmless error analysis of trial court's denial of defendant's motion to appoint an *Ake* expert because the court could "conceive of few errors that are more structural in nature than one which eliminates a basic tool of an adequate defense and in doing so dramatically affects the accuracy of the jury's determination").

{37} As the record below demonstrates, this case implicates the rule announced in *Subin,* 2001–NMCA–105, ¶¶ 2, 4, 131 N.M. 350, 36 P.3d 441, that when an otherwise indigent defendant is able to raise funds to retain counsel—through third parties or some other means—courts have no authority to order state funding for necessary ancillary services, such as experts or investigation, that the defendant cannot afford. Here, defense counsel requested state funding for necessary experts that his client was unable to pay for, and the district court ruled that *Subin* prevented the court from ordering such funding. It was only after requesting state funding for expert witnesses that defense counsel moved to withdraw from the case in favor of appointment of a public defender.

{38} In *Brown,* we recently modified the rule in *Subin,* holding that courts do have inherent authority to order state funding for expert witnesses and other ancillary services for indigent defendants represented by pro bono counsel. *Brown,* 2006–NMSC–023, ¶ 25, 139 N.M. 466, 134 P.3d 753 ("[I]ndigent defendants represented by *pro bono,* contract, or Department counsel should have equal access to expert witness funding *provided that* the expert witness meets all of the

standards promulgated by the Department."). Thus, representation by the PDD is not necessarily required in order for indigent defendants to receive state funding for other necessary defense services. *See id.* (observing that the right to be provided with the basic tools of an adequate defense "is not contingent upon the appointment of Department counsel; it is inherent under the state and federal Constitutions"); *see also State v. Apodaca,* 80 N.M. 244, 246, 453 P.2d 764, 766 (Ct.App.1969) (observing that New Mexico's Indigent Defense Act "recognizes that a defendant may be represented by employed counsel and still be indigent in connection with other matters pertaining to defense of the case").

{39} In light of *Brown,* Defendant argues that under these circumstances, the district court should have obtained the necessary resources from the PDD. We note that most states that have interpreted their indigent defense statutes in similar cases have held that indigent defendants are not required to be represented by the public defender in order to receive state funding for ancillary services that comprise "the basic tools of an adequate defense." *Ake,* 470 U.S. at 77, 105 S.Ct. 1087 (quoted authority omitted); *see Brown,* 2006–NMSC–023, ¶ 26 n. 1, 139 N.M. 466, 134 P.3d 753 (noting that "the majority of state courts that have examined this issue have concluded that . . . indigent defendants represented by *pro bono* **or retained** counsel are entitled to state funding for various defense costs, including expert witness fees," and citing cases (emphasis added)); *English v. Missildine,* 311 N.W.2d 292, 294 (Iowa 1981) (noting that "the sixth amendment provides authority for furnishing investigative services to indigents at public expense without regard to whether the indigent is represented by counsel at public expense"); *Ex parte Briggs,* 187 S.W.3d at 468–69 (holding that retained trial counsel was ineffective for failing to call necessary expert witnesses due to lack of funds, and noting that "the trial court undoubtedly would have permitted state-funded appointment of expert assistance under *Ake* had applicant's attorney put on proof of his client's present indigency"); *State v. Burns,* 4 P.3d 795, 801–02 (Utah 2000) (statutory right to publicly funded ex-

pert assistance under Utah's Indigent Defense Act could not be conditioned upon defendant's accepting court-appointed counsel in lieu of private counsel retained at her father's expense); *State ex rel. Rojas v. Wilkes*, 193 W.Va. 206, 455 S.E.2d 575, 577 (1995) (stating funds with which defendant's family retained private counsel were irrelevant to defendant's right to have necessary expert assistance provided at the state's expense); *see also Ex parte Sanders*, 612 So.2d 1199, 1201 (Ala.1993); *Anderson v. Justice Court*, 99 Cal.App.3d 398, 160 Cal.Rptr. 274, 277 (1979); *Arnold v. Higa*, 61 Haw. 203, 600 P.2d 1383, 1384–85 (1979); *State v. Pederson*, 600 N.W.2d 451, 454 (Minn.1999); *State v. Manning*, 234 N.J.Super. 147, 560 A.2d 693, 699 (1989), *abrogated on other grounds by State v. Hill*, 182 N.J. 532, 868 A.2d 290 (2005); *Spain v. District Court*, 882 P.2d 79, 81 (Okla.Crim.App.1994). *But see Moore v. State*, 390 Md. 343, 889 A.2d 325, 343 (2005) (holding that the state may condition the receipt of constitutionally mandated services on representation by the Office of the Public Defender).[3]

3. Several jurisdictions have also addressed the administrative burdens and impact on the public fisc of requiring the government to fund necessary ancillary services for indigent defendants represented by retained counsel. *See Brown*, 2006–NMSC–023, ¶ 28, 139 N.M. 466, 134 P.3d 753 (noting that "the administrative mechanism already exists to facilitate distribution of funds to indigent defendants in need of expert witness fees who are represented by non-Department counsel"); *see also Fullan v. Comm'r of Corrections of N.Y.*, 891 F.2d 1007, 1011 (2d Cir.1989) (holding that defendant represented by private counsel was entitled to free transcript and noting that, while "the expense to the State of providing free assistance to indigent appellants is great, .... the expense ... would be greater if the State were required to pay the attorney's fee as well as the cost of the transcript"); *Chao v. State*, 780 A.2d 1060, 1072–73 (Del.2001), *overruled on other grounds by Williams v. State*, 818 A.2d 906 (Del.2002) (rejecting argument that such a regime would create a judicial "hodgepodge" in which the claims for services would overburden the system and the OPD would lose control over its budget because (1) the determination of indigency was a routine practice, (2) trial courts were routinely asked whether certain investigative services were "necessary to a defense," and (3) public funding would only be available in limited circumstances under trial court discretion, where the court deemed it unnecessary for the private counsel to withdraw in favor of the

{40} However, this is an issue we need not decide in this particular case because defense counsel sought, as a last resort, to withdraw so that the PDD could assume all costs of the defense. The district court should have granted that request. Whatever the full extent of the court's options may have been, the Sixth Amendment precludes the one choice that was apparently made. Counsel could not be compelled to continue to represent his client when faced with serious felony charges and no ability to provide an effective defense.

{41} We hold that Defendant was deprived of effective assistance of counsel in violation of his Sixth Amendment rights and is therefore entitled to a new trial. We address Defendant's other points of error to avoid repetition of any similar errors on retrial.

## Negligent Child Abuse Instruction

{42} The jury in Defendant's second trial was given an instruction on negligent child abuse patterned after UJI 14–602 NMRA. That instruction stated:

public defender); *English*, 311 N.W.2d at 293–94 (noting that "[i]t would be strange if the Constitution required the government to furnish both counsel and investigative services in cases where the indigent needs and requests public payment for only investigative services"); *Manning*, 560 A.2d at 699 (noting "the increasingly overcrowded docket and insufficient resources, both monetary and personnel, of the Office of the Public Defender" and reasoning that "[p]ermitting the cost of legal services [for indigent defendants] to be borne by a charitable attorney or a third party would relieve the State of the legal costs and use of personnel involved in such defenses," thus avoiding the absurd result of requiring the State "to pay for both legal and expert services, when it could have saved the cost, in both money and personnel, of the legal services"); *State v. Handson*, 166 Vt. 85, 689 A.2d 1081, 1083–84 (1996) (explaining that allowing necessary services for pro se defendants to be State-funded would not lead to an "unfettered" reimbursement of expenses incurred by defendants because "[t]o receive reimbursement, a defendant must show that a requested service is necessary to mount an adequate defense," and "[p]ayment for the services that permit a defendant to exercise the right to appear pro se is not an extra expense imposed on the Defender General, but a substitute for the expense of representation by counsel").

To find that Jake Schoonmaker acted with reckless disregard, you must find that Jake Schoonmaker knew or should have known his conduct created a substantial and foreseeable risk, he disregarded that risk and he was wholly indifferent to the consequences of the conduct and to the welfare and safety of [Child].

Defendant claims that these instructions are in conflict with New Mexico law because criminal negligence in New Mexico requires subjective knowledge of the risk of harm. Because the instruction contains a "should have known" standard, Defendant argues that it impermissibly allows conviction on a civil negligence standard.

{43} Defendant is mistaken. What distinguishes civil negligence from criminal negligence is not whether the person is subjectively aware of a risk of harm; rather, it is the magnitude of the risk itself. The definition of criminal negligence in the Model Penal Code reflects this distinction:

A person acts negligently with respect to a material element of an offense when he **should be** aware of a **substantial and unjustifiable risk** that the material element exists or will result from his conduct. **The risk must be of such a nature and degree that the actor's failure to perceive it,** considering the nature and purpose of his conduct and the circumstances known to him, **involves a gross deviation from the standard of care** that a reasonable person would observe in the actor's situation.

Model Penal Code § 2.02(c) (Official Draft and Revised Comments 1962) (emphasis added). The Legislature has indicated an intent to adopt a similar standard for negligent child abuse that does not require subjective knowledge of the risk. *See* NMSA 1978, § 30–6–1(A)(3) (1973, as amended through 2004) (stating that, as used in the child abuse statute, " 'negligently' refers to criminal negligence and means that a person knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child"). This standard is different from a recklessness standard which requires that the person "**consciously** disregards a substantial and unjustifiable risk" that harm will result from his conduct. Model Penal Code § 2.02(c).

{44} We recognize that some New Mexico cases and statutes refer to "criminal negligence" and "recklessness" interchangeably, or state that criminal negligence requires a finding that the defendant acted with willful disregard of the rights or safety of others. *See State v. Yarborough*, 1996–NMSC–068, ¶ 20, 122 N.M. 596, 930 P.2d 131 (holding that criminal negligence is required to convict a defendant of vehicular homicide and the jury must find that the defendant "drove with willful disregard of the rights or safety of others and in a manner which endangered any person or property" (quoted authority omitted)); *State v. Stewart*, 2005–NMCA–126, ¶ 32, 138 N.M. 500, 122 P.3d 1269 (stating that "[c]riminal negligence ... has been equated with recklessness" (citing *State v. Jacobs*, 102 N.M. 801, 803, 701 P.2d 400, 402 (Ct.App.1985))); *see also* NMSA 1978, § 30–17–5(G) (1970, as amended through 2006) (providing that "[n]egligent arson consists of a person recklessly starting a fire or causing an explosion"). However, those cases and statutes involve different crimes for which a recklessness standard may be more appropriate and for which there is no indication of legislative intent to require a lower *mens rea* standard. In contrast, Section 30–6–1 evinces a legislative intent to use the concept of criminal negligence, not recklessness, as the standard for negligent child abuse.

{45} We also acknowledge that our UJI 14–602 on negligent child abuse appears to be somewhat inconsistent by using a "should have known" standard and then later requiring that the defendant have "disregarded [the] risk and ... [been] wholly indifferent to the consequences." How can one disregard or be indifferent to a risk of which he is unaware? This is an issue that the appropriate rules committee should address, as the instruction would be improved by more clearly emphasizing the magnitude of the risk as the critical factor distinguishing criminal from civil negligence. However, its use did not result in error in this case. The instruction is consistent with the Model Penal Code definition of criminal negligence in not requiring a subjective awareness of the risk, while still communicating that the risk must be substantial.

### Double Jeopardy

### Acquittal of Intentional Child Abuse As Affecting Retrial On Negligent Child Abuse

{46} Defendant argues that his rights to due process and to be free from double jeopardy were violated when the district court refused to instruct the jury that it should inform the court if, during deliberations, it found that Defendant had acted intentionally—a basis for prosecution which was barred by Defendant's acquittal of intentional child abuse at his first trial. We disagree that Defendant's retrial for negligent child abuse after the jury acquitted him of intentional child abuse resulted in a double jeopardy violation.[4] We do perceive a problem, however, in the way the second trial went forward.

{47} Specifically, the State put on the same case in the second trial as it did in the first, and the State's theory of the case appeared to ask the jury to find that Defendant had intentionally harmed Child—something of which he had clearly been acquitted. The State argued to the jury that there were only three ways the injuries suffered by Child could have been caused: (1) a fall from at least two stories; (2) a high speed car crash where the person is ejected from the vehicle; or (3) violent shaking of a baby. The first two possibilities being ruled out, the last was the only explanation for Child's injuries. The State's experts testified to this theory and also stated that Child's injuries could not have been caused by panicked shaking or shaking the baby to wake him, only violent shaking could cause these injuries. Indeed, two of the State's experts, Dr. Campbell and Dr. Hart, testified that the only way Child's injuries could have occurred is by being "vigorously and *intentionally*" shaken. They also stated that Child's injuries could not be caused by "non-intentional" conduct and that Child could not have received a "non-intentionally inflicted injury." The State argued,

and its experts confirmed, that the injuries were sustained during the two-hour period that Defendant was left alone with the baby; they could not have happened earlier. Lastly, the State argued that Defendant was lying about what happened during the time he was alone with the baby and had taken steps to cover up what he had done.

{48} The State's case being presented in this manner, a real danger arose that the jury might base its decision to convict on an understanding that Defendant intentionally abused Child—something of which Defendant had already been acquitted. The jury was told (with no contradictory expert testimony) that Defendant's story—i.e., panicked shaking, shaking the baby to wake him up, shaking the baby in the car seat—could not have caused Child's injuries. Thus, under the State's theory of the case, which went unrebutted by expert testimony, the jury had to find that Defendant violently shook Child; the State's theory and its expert evidence did not allow for the injuries to have happened any other way. It is true that the *actus reus* element of a crime is distinct from the *mens rea* element, and a person could intend to violently shake a baby without a subjective awareness of the risk of harm or with indifference to that risk. *See Schoonmaker,* 2005–NMCA–012, ¶ 26, 136 N.M. 749, 105 P.3d 302. Such a violent, intentional act, however, can also support an inference that it was intended to cause harm, an impermissible inference in this case due to the previous jury verdict of acquittal.

{49} To prevent a double jeopardy or due process problem, Defendant requested that the jury be instructed to inform the district court if it found that Defendant had intentionally abused the Child, at which point the court would presumably be asked to dismiss the charge on double jeopardy grounds. The instruction was refused. While we seek to alert the district court of the danger of a

4. Our double jeopardy jurisprudence looks to whether each of the crimes alleged to be the same has an element the other does not have. *See Schoonmaker,* 2005–NMCA–012, ¶¶ 20–21, 136 N.M. 749, 105 P.3d 302. We agree with the Court of Appeals' analysis of this issue and its holding that intentional child abuse is not the same crime as, or a lesser included offense of, negligent child abuse. *Id.* ¶ 27. As the Court of Appeals correctly observed, "[i]t is ... clear that these two statutes are mutually exclusive—one cannot commit an intentional act and an unintentional but substantially risky act at the same time, even though the act is voluntary as to both and the evidence may be sufficient to charge both offenses as alternative theories." *Id.*

double jeopardy or due process violation on retrial, we do not decide at this time what the remedy should be, but prefer instead to leave it to the discretion of the district court to devise a solution in consultation with counsel.

**Merger of Convictions**

■ {50} Defendant contends that the district court erred in failing to vacate his conviction for one of the alternative counts of child abuse. This Court has stated that "concurrent sentencing does not adequately remedy the imposition of impermissible multiple punishments for a single offense; double jeopardy requires that the lesser offense merge into the greater offense such that the conviction of the lesser offense, not merely the sentence, is vacated." *State v. Santillanes,* 2001–NMSC–018, ¶ 28, 130 N.M. 464, 27 P.3d 456 (citing *State v. Pierce,* 110 N.M. 76, 87, 792 P.2d 408, 419 (1990)). Therefore, the district court was required not only to "merge" Defendant's convictions on alternative counts of negligent child abuse, but to vacate one of those alternative convictions; simply sentencing Defendant for only one conviction was not enough. *See State v. Mercer,* 2005–NMCA–023, ¶ 29, 137 N.M. 36, 106 P.3d 1283 (stating that "[i]f, upon retrial, the jury again convicts [the defendant] of alternatives on any count, one alternative conviction must be vacated").

**Earned Meritorious Deductions Act**

■ {51} Defendant argues that the district court's finding that the offense was a serious violent offense, thus limiting Defendant's good time credit in prison to four days per month under the Earned Meritorious Deductions Act, NMSA 1978, § 33–2–34(L)(4)(*o*) (1999, as amended through 2006) (EMDA), violated Defendant's right to be free of double jeopardy.

{52} At sentencing, the trial judge said that he did not believe that Defendant had any intention of seriously harming Child and that Defendant had "led an exemplary life," but because of the severity of the harm suffered by Child, the offense qualified as a serious violent offense under the EMDA. Defendant argues that in so ruling, the court impermissibly used an element of the crime as a factor in finding a serious violent of-

fense, thereby punishing Defendant over and above the punishment already established for negligent child abuse. We disagree.

{53} Limiting a defendant's ability to earn meritorious deductions does not result in punishment beyond that which has been statutorily established for the offense. In fact, even a defendant found to have committed a serious violent offense can still earn meritorious deductions of four days for every month served. Thus, a district court's determination that a defendant found guilty of negligent child abuse committed a serious violent offense under the EMDA cannot result in punishment beyond the maximum sentence of eighteen years established by our Legislature. Therefore, there is no double jeopardy issue here.

**CONCLUSION**

{54} We reverse and remand for a new trial.

{55} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA, PETRA JIMENEZ MAES, Justices, and RICHARD E. RANSOM (Pro Tem).