**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: _____**

**Filing Date: August 8, 2013**

**Docket No. 31,646**

**STATE OF NEW MEXICO,**

       **Plaintiff-Appellant,**

**v.**

**GERARD MURAIDA,**

       **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Charles W. Brown, District Judge**

Gary K. King, Attorney General
Rebecca Salwin, Assistant Attorney General
Santa Fe, NM

for Appellant

Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Luis G. Stelzner
Sara N. Sanchez
Albuquerque, NM

for Appellee

**OPINION**

**HANISEE, Judge.**

**{1}**    The State appeals the district court's dismissal of the criminal complaint charging Defendant Gerard Muraida, M.D., with abuse and/or neglect of a nursing home resident, who died due to blood loss from an excessively prescribed quantity of the anticoagulant drug Coumadin. The State argues that the district court impermissibly decided the merits of the case by implicitly engaging in fact finding in its dismissal of the complaint pursuant to Defendant's pretrial *Foulenfont* motion. *See State v. Foulenfont*, 1995-NMCA-028, ¶ 2, 119

1

N.M. 788, 895 P.2d 1329 (allowing the dismissal of criminal charges on purely legal grounds when the district court assumes the factual predicate underlying the charges to be true). Because the complaint stated facts that if proven are sufficient to convict Defendant of abuse and/or neglect, we reverse.

## I.     FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

{2}     The State's complaint incorporates a sworn declaration (the report) by elder care specialist Loren G. Lipson, M.D., regarding the circumstances of the resident's (identified herein as D.A.) medical care and death and alleges the facts we recite herein, which we must assume to be true. D.A., then eighty-four years old, suffered a heart attack and subsequently received acute care at the Heart Hospital of New Mexico in Albuquerque from August 2 to August 15, 2005. On August 15, D.A. was transferred to Albuquerque Care Center (ACC) for rehabilitation, where Defendant became her attending physician. Defendant saw D.A. once on August 16. As part of the treatment for D.A.'s heart attack, Defendant prescribed Coumadin, which D.A. had already begun to receive while being treated at the Heart Hospital of New Mexico. Coumadin is "an anti[]coagulant used to thin blood so it can more easily pass through constricted blood vessels."

{3}     Initially, Defendant utilized a blood test called Protime to monitor the anticoagulative effects of Coumadin on D.A. This test measures an individual's clotting time (called the INR) in comparison with the standard clotting time for the average person, for which a baseline INR value of 1.0 is assigned. In this case, the therapeutic INR goal for D.A. was between 2.0 and 3.0. The complaint asserts that this test was an important tool for Defendant to evaluate and monitor D.A.'s coagulation because "Coumadin is a potentially dangerous drug and can result in excessive bleeding due to decreased clotting." At the admission examination conducted by Defendant on August 16, Defendant noted that D.A. had "multiple bruises[,] 'areas related to her anti[]coagulation and hospitalization.' He also noted an elevated INR of '3.4' which was higher th[an her therapeutic] 'INR' goal of '2 to 3.' [At that time, D.A.'s] Coumadin dose was 1.0 mg per day." Several days later on August 19, D.A.'s "INR was 1.74, [and Defendant] increased the Coumadin dose on [August 20] to 1.5 mg per day. Inexplicably, no additional INR's were ordered for (a week) even though a new dose of Coumadin was started, and [D.A.'s] INR was elevated above the desired range [at the time of her] admission." In his report, Dr. Lipson explained that "[w]hen the Coumadin dose is increased or decreased[,] the INR must be measured daily until a relative steady state is obtained. If too much Coumadin is given, any wound, vessel abnormality[,] or lesion where there may be a tendency to bleed has a greater chance of bleeding."

{4}     Also pursuant to Dr. Lipson's report, the complaint maintains that "Dr. Muraida did not set blood pressure notification parameters, and actually ignored her low blood pressure when he examined her." Notably, "low blood pressure [can be a sign of] acute bleeding and . . . dehydration." Defendant also "failed to reduce [D.A.'s] blood pressure medication dosages or check her hydration status or hematologic status—all placing her at risk for further heart damage, stroke or other vital organ ischemic damage."

**{5}** Six days following the increase in Coumadin dosage and upon discovery of blood in D.A.'s stool on August 26, Defendant "ordered [ACC] nursing to schedule a colonoscopy with a gastroenterologist . . . 'for possible hemorrhoids' ([without a] basis in [her] chart for that diagnosis). [In addition, t]he appointment was not asked for on an emergent basis." No INR test was administered at that time. Dr. Lipson explained that the "[s]tandard of care . . . demanded an immediate evaluation of her gastrointestinal bleeding in a hospital, discontinuation of the Coumadin for at least two days[,] and daily measurement of her INR. Any gastrointestinal bleeding would place [D.A.] at risk for further heart damage from anemia and hypoxia."

**{6}** The report also stated that Defendant was informed that D.A. had a nose bleed, knee swelling, and bright red blood in her stools after she suffered falls getting out of bed, yet Defendant did not properly address those issues. Ultimately, on September 1, D.A. was sent to the emergency room for acute rectal bleeding. The affidavit states that she was "massively over anticoagulated," possessing an INR "greater than 12.5[,] despite her anticoagulation goal being [an INR of 2.0 to 3.0]." The complaint alleges that D.A. died from blood loss from a tumor in her colon as a result of the anticoagulation treatment. Dr. Lipson stated that "[h]ad [Defendant] on [August 26] immediately and aggressively followed up on her initial reported rectal bleeding by stopping the Coumadin and getting an emergent colon[o]scopy [, D.A.] would not have died on [September 1, 2005]." Dr. Lipson concluded that Defendant's "grossly negligent conduct directly led to [D.A.'s] death."

**{7}** Defendant's pretrial *Foulenfont* motion, filed prior to any determination of probable cause by either a grand jury or a judge at a preliminary hearing, asserted that the charges against him should be immediately dismissed because the complaint and supporting affidavit did not allege facts sufficient to support a conviction for abuse and neglect of D.A. The State responded that ample facts were alleged in the complaint and supporting documents to establish Defendant's criminal liability. The State also maintained that to the extent Defendant's motion required inquiry into the facts, such questions should be resolved at trial. The district court granted the motion and dismissed all charges against Defendant, determining that "the undisputed facts cannot, as a matter of law, sustain the elements of the criminal offenses charged." The State appeals, arguing that the district court wrongly decided the merits of the case before trial.

## II.    DISCUSSION

**{8}** Defendant was charged in a two-count criminal complaint with violating the Resident Abuse and Neglect Act (the Act). *See* NMSA 1978, §§ 30-47-1 to -10 (1990, as amended through 2010). Both counts alternatively alleged abuse and neglect under the Act. Count one was premised on injuries suffered by D.A.; count two was premised on her death.

**{9}** The Act provides criminal penalties for medical care administered in a residential setting that falls beneath legislated standards of acceptability. *See* § 30-47-4 (setting forth the criminal penalties for resident abuse); § 30-47-5 (setting forth the criminal penalties for

3

resident neglect). Under Section 30-47-3(A)(4), " 'abuse' means any act or failure to act performed intentionally, knowingly[,] or recklessly that causes or is likely to cause harm to a resident, including: . . . medically inappropriate conduct[.]" Under Section 30-47-3(F),

> "neglect" means, subject to the resident's right to refuse treatment and subject to the caregiver's right to exercise sound medical discretion, the grossly negligent:
>
>     (1)    failure to provide any treatment, service, care, medication or item that is necessary to maintain the health or safety of a resident;
>
>     (2)    failure to take any reasonable precaution that is necessary to prevent damage to the health or safety of a resident; or
>
>     (3)    failure to carry out a duty to supervise properly or control the provision of any treatment, care, good, service or medication necessary to maintain the health or safety of a resident[.]

Thus, at minimum, the complaint must allege facts that demonstrate Defendant acted in an abusive manner or was "grossly negligent" when he neglected to take reasonable precautions or to provide or supervise the provision of appropriate care, treatment, service, or medication necessary to the maintenance of D.A.'s health. *Id.*

{10} As Section 30-47-3(F) does not specify what it means by "grossly negligent" conduct, we must clarify whether the type of negligence at issue is criminal or civil. "What distinguishes civil negligence from criminal negligence is not whether the person is subjectively aware of a risk of harm; rather, it is the magnitude of the risk itself." *State v. Schoonmaker*, 2008-NMSC-010, ¶ 43, 143 N.M. 373, 176 P.3d 1105.

> In order to be criminally negligent, a defendant need not be subjectively aware of a risk, but the risk must be one of which he should be aware. The risk must be of such a nature and degree that the actor's failure to perceive it involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

*State v. Webb*, 2013-NMCA-027, ¶ 22, 296 P.3d 1247 (alterations, internal quotation marks, and citation omitted), *cert. denied*, 2013-NMCERT-002, 300 P.3d 132; *see* UJI 14-133 NMRA (defining criminal negligence). Thus, to commit criminal negligence, "there must be an actual or imputed foreseeability of danger directed toward the [victim] who might be injured as a result of [the d]efendant's acts." *Webb*, 2013-NMCA-027, ¶ 23 (internal quotation marks and citation omitted). Moreover, that risk of harm must be "substantial and unjustifiable." *State v. Chavez*, 2009-NMSC-035, ¶ 45, 146 N.M. 434, 211 P.3d 891 (internal quotation marks and citation omitted).

4

**{11}** Since the Legislature did not specify either the civil or criminal category of negligence, we take heed that "statute[s] defining criminal conduct must be strictly construed." *Santillanes v. State*, 1993-NMCA-012, ¶ 25, 115 N.M. 215, 849 P.2d 358. "Doubts about the construction of a criminal statute are resolved in favor of the rule of lenity." *State v. Bybee*, 1989-NMCA-071, ¶ 12, 109 N.M. 44, 781 P.2d 316. "A criminal statute may not be made applicable beyond its intended scope, and it is a fundamental rule that crimes must be defined with appropriate definiteness. Similarly, a statute will not be read to apply to a criminal offense unless the legislative proscription is plain." *Id*. (citation omitted). Furthermore, it is "well-established in New Mexico, that only criminal negligence may be a predicate for a felony unless another intention is *clearly expressed* by the [L]egislature." *State v. Yarborough*, 1996-NMSC-068, ¶18, 122 N.M. 596, 602, 930 P.2d 131 (emphasis added). In accordance with these tenets of construction and New Mexico precedent, we conclude that the narrower standard of criminal negligence is applicable to Section 30-47-3(F) of the Act, which markedly punishes the neglect of a resident resulting in any harm as a felony. *See* § 30-47-5(B)-(D) (stating that whoever commits neglect of a resident resulting in physical harm, great psychological harm, great physical harm, or death is guilty of a felony).

**{12}** Having clarified the nature of neglect required to be proven by the State in order to convict Defendant of the crimes at issue on that basis, we review de novo whether the district court erred in granting Defendant's *Foulenfont* motion. *State v. LaPietra*, 2010-NMCA-009, ¶ 5, 147 N.M. 569, 226 P.3d 668 ("The contours of the district court's power to conduct a pretrial hearing on a motion to dismiss charges brought under Rule 5-601 [NMRA] is a legal question reviewed under a de novo standard."). Specifically at issue is the propriety of the district court's finding that the State failed to allege sufficient facts to support a conviction under either Section 30-47-4 (abuse of a resident) or Section 30-47-5 (neglect of a resident) in either or both of the two counts that comprised the criminal complaint. The district court's authority to rule on pretrial motions in criminal matters is dictated by Rule 5-601(B), which states that "[a]ny defense, objection or request which is capable of determination without a trial on the merits may be raised before trial by motion." As explained in *Foulenfont*, dismissal of charges can only be granted if such charges can be disposed of solely by deciding a question of law. 1995-NMCA-028, ¶ 5. "Questions of fact, however, are the unique purview of the jury and, as such, should be decided by the jury alone." *LaPietra*, 2010-NMCA-009, ¶ 7.

**{13}** In *LaPietra*, this Court was presented with circumstances similar to the case at bar and by our ruling declined to expand the breadth of the district court's *Foulenfont* authority beyond its power to dismiss charges based on dispositive questions of law. 2010-NMCA-009, ¶¶ 10-16. Although *LaPietra* involved allegations of child abuse, and not residential care patients, the defendants in that case likewise successfully brought a *Foulenfont* motion arguing that the State lacked evidence to prove that the defendants caused the children to be placed in a situation that endangered their life or health. *LaPietra*, 2010-NMCA-009, ¶ 8. In reversing, we explained that it was the province of the jury to decide the issue of who committed the abuse. *Id*. ¶ 9. We stated that

5

the argument that [the d]efendants make is essentially advocating how to characterize the pretrial transcripts of witness interviews that were given to the district court. . . . [The d]efendants' argument, while stipulating to what is known at the pretrial juncture, amounts to a disagreement with the [s]tate as to what a reasonable jury could conclude.

. . . .

The evidence contained in the transcripts can be viewed in a variety of ways, one of which would allow a jury to conclude that either [the d]efendant or both [the d]efendants committed the abuse, allowed the abuse to happen, or knew, or should have known, that the abuse was occurring. . . . While the district court may have thought the [s]tate had a weak case, the district court did not have the opportunity to observe testimony of witnesses under oath, judge their credibility, weigh the evidence, and hear opposing arguments after the close of evidence.

*Id*. ¶¶ 9, 11. Our decision thus recognized that it would be impossible to determine what a jury might conclude and that it was the jury's job "to judge the credibility of witnesses and determine the weight of evidence." *Id.* ¶ 11 (internal quotation marks and citation omitted).

**{14}** Similarly, at issue here is whether the district court exceeded its authority under Rule 5-601(B) and *Foulenfont* when it concluded that there were insufficient facts alleged to convict Defendant of the charged crimes. Defendant's *Foulenfont* motion asserted that "the alleged facts as a matter of law could not support a conviction of [Defendant] for [a]buse or [n]eglect of a [r]esident" because "neither the [c]omplaint nor the affidavit supporting it reflects that [Defendant] acted or failed to act intentionally, knowingly, recklessly, or criminally negligently." Defendant contended that "the State . . . seeks to convict [Defendant] based on conduct that, at most, could amount to civil negligence, or to hold him vicariously criminally liable for collective actions of his alleged 'physician extenders.' " Defendant also contends on appeal that the State alleged insufficient facts to show that Defendant had a "legal duty to further inform himself, examine D.A. again, or inquire further about her condition prior to her death." *See State v. Greenwood*, 2012-NMCA-017, ¶ 35, 271 P.3d 753 (stating that an omission can only constitute a crime where the defendant had a legal duty to act), *cert. denied*, 2012-NMCERT-001, 291 P.3d 598.

**{15}** We hold that the complaint and accompanying affidavit alleged sufficient facts, if proven, to convict Defendant for abuse and/or neglect of D.A. under the Act. The complaint states that Defendant increased D.A.'s dosage of Coumadin, a dangerous and potentially lethal anticoagulant, and subsequently failed to take the reasonable precaution associated with monitoring the effect of the prescribed dosage of that medication: testing her INR daily. A jury could reasonably conclude that this omission amounted to a failure to act performed intentionally, knowingly, or recklessly (abuse), or amounted to a gross deviation from the applicable standard of care rising to the level of criminal negligence (neglect). The

6

complaint also indicates that Defendant failed to consider and modify D.A.'s blood pressure medication, which under the Act's definition of abuse or neglect could likewise suffice, if proven at trial, to establish guilt. It further states that Defendant failed to properly supervise the implementation of D.A.'s care, treatment, and medication while under his care, because after he increased her Coumadin dosage, he failed to act in response to her worsening symptoms. Significantly in this regard, the Act establishes as neglect the criminally negligent failure to carry out a duty to supervise the medical care and treatment of a resident.

{16}     Also significantly, the complaint states that Defendant failed to order the proper care for D.A. upon discovery of blood in her stool on August 26th. Rather than determine whether the symptom was a product of over-anticoagulated blood due to Coumadin, Defendant ordered a colonoscopy. Moreover, the complaint alleges that he did so on a non-emergent basis, despite the apparent fact that D.A. then required much more drastic and urgent treatment. The affidavit expressly states that, had Defendant given D.A. the appropriate care at this juncture, she would not have bled to death internally from her colon. Again, under the definitions of the Act, Defendant's own actions and inactions as alleged satisfy the threshold standard required to survive a *Foulenfont* motion. A jury could conclude that the events alleged posed a substantial and unjustifiable risk to D.A.'s life. These facts provide a sufficient basis to conclude that Defendant was personally grossly negligent in his treatment and care of D.A. and that he had a duty under the Act to provide proper care as the attending physician who prescribed increased dosages of the fatal anticoagulant to D.A.

{17}     We conclude that the district court erred in determining that the State alleged insufficient facts to support convictions for abuse and/or neglect. As in *LaPietra*, Defendant's argument both below and on appeal amounts to a disagreement as to how the factfinder should interpret the facts alleged. Such interpretations benefit from the opportunity to observe the testimony of witnesses, judge their credibility, weigh the evidence, and hear the parties' arguments after the close of evidence, as a jury would have. Such contested questions of fact in criminal cases rest within the exclusive province of jurors.

{18}     To the extent Defendant argues that the complaint alleged insufficient facts to prove Defendant's intent and that "[a]t no time did the State suggest that it could reasonably present evidence at trial to show what [Defendant] did or did not do, or what he knew or did not know[,]" we conclude that Defendant's awareness of the substantial and unjustifiable risk of harm to D.A. caused by his actions can be inferred from the facts stated in the complaint and affidavit. *See Schoonmaker*, 2008-NMSC-010, ¶ 43 (stating that the defendant is deemed to have acted negligently "when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct" and explaining that "[t]he risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." (emphasis, internal quotation marks, and citation omitted)).

7

It is well established that the fact finder may infer from circumstantial evidence that the defendant acted with the requisite intent; direct evidence of the defendant's state of mind is not required. *See State v. Largo*, 2012-NMSC-015, ¶ 31, 278 P.3d 532. Furthermore, "[a] defendant's knowledge or intent generally presents a question of fact for a jury to decide." *State v. Wasson*, 1998-NMCA-087, ¶ 12, 125 N.M. 656, 964 P.2d 820. As such, it was improper for the district court to preemptively resolve this question of fact in the context of a *Foulenfont* motion. Moreover, the State need not present evidence to prove its case at the preliminary stage of the proceedings that existed at the time of the district court's ruling. Under Rule 5-601, the district court's decision must be based solely in law, and it must not consider the merits of the case.

{19}  Defendant also asserts that "the State already conceded below that it cannot and will not be able to prove who took what action and who knew what information with respect to D.A.'s care." We believe this assertion is based on an inaccurate understanding of the proceedings below. In the transcript from the *Foulenfont* motion hearing quoted in part by Defendant, the State specifically discussed falls suffered by D.A. between August 26 and 29. The State explained that "the difficulty with this particular fact situation is that preceding August 29, on [August] 26 . . ., D.A. fell twice. On [August] 28, she fell a third time, and what happened or to whom it might have been reported or whatever is somewhat of a mystery. You can't really tell."

{20}  Whatever transpired with regard to D.A.'s falls does not diminish the significance of the State's factual statements that it was Defendant who prescribed an increased amount of Coumadin and failed to take precautions to monitor D.A. thereafter and that it was Defendant who failed to order the proper care for D.A. upon discovery of blood in her stool on August 26. The State did not concede that it cannot prove facts related to these failures. The State only appears to have conceded that it cannot identify how the falls occurred between August 26 and 29 and who was informed of them. Sufficient facts were thus alleged to convict Defendant of abuse and/or neglect, not based on unknown events, but rather on Defendant's actions and allegedly gross deviation from the standard of care as D.A.'s attending physician.

{21}  Lastly, to the extent Defendant contends that the complaint attempts to make Defendant " 'responsible' for the actions of other people—such that he could be held criminally liable for the[ir actions]," we disagree. Defendant argues that there is no law stating he can be held "criminally responsible for the actions of other, non-employee providers who treat the physician's patient." Defendant is mistaken as to the nature of what is required to convict him of neglect under the Act. Specifically, the Act establishes criminal liability, not for the actions of others, but for Defendant's own criminally negligent failure to supervise them in their capacity as medical caregivers acting to maintain the health of a resident under Defendant's direction.

{22}  Defendant nonetheless asserts that the State has failed to allege any evidence sufficient to prove supervision. Yet the complaint states that Defendant's team of "physician

8

extenders" included a certified physician assistant and a certified nurse practitioner who had a collaborative practice agreement with Defendant. The complaint charges Defendant with medically inappropriate and life-threatening conduct, failures to provide treatment and care as D.A.'s attending physician, failures to take precautions with her care, and failures to supervise or control her treatment, in accordance with the definitions of abuse and neglect in Section 30-47-3. As explained above, the complaint provides several instances where Defendant personally acted or failed to act, jeopardizing D.A.'s life. As such, the complaint sufficiently charges Defendant with liability for his own criminally negligent conduct and supervision, not for the conduct of others. Based on what was alleged by the State in the criminal complaint, there are sufficient facts for this case to proceed to trial, or at the very least, to a preliminary hearing to provide the State with an opportunity to make its case.

**{23}** Because the district court erred in granting Defendant's *Foulenfont* motion, we reverse and remand this case to the district court. Upon remand, if the State chooses to proceed, Defendant will have an opportunity for a preliminary examination, after which the district court can weigh evidence and assess the existence of probable cause from a developed factual record. *See State v. Archuleta*, 1970-NMCA-131, ¶ 25, 82 N.M. 378, 482 P.2d 242 (stating that where the "defendant was charged by an information, he ha[s] a constitutional right to a preliminary examination"); UJI 14-8001 (instructing grand jurors that a decision on probable cause must be based "solely upon the evidence received" which may be determined to be "true or false" and given "whatever weight . . . it deserves").

## IV.     CONCLUSION

**{24}**    For the reasons stated above, we reverse.

**{25}    IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Judge**

_____
**MICHAEL E. VIGIL, Judge**